THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CURTIS WARD, Defendant-Appellant.

First District (2nd Division)   No. 77-161

Opinion filed August 15, 1978.

Sam Adam, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Rimas F. Cernius, and James M. Thunder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BROWN delivered the opinion of the court:

Defendant, Curtis Ward, was charged by information with one count of attempt murder and three counts of aggravated battery. The aggravated battery counts were *nolle prossed* by the State after they rested their case. A jury subsequently found defendant guilty of attempt murder and judgment was entered on the verdict. Defendant appeals from that judgment contending (1) that the trial court committed reversible error by denying defendant's motion to suppress the pretrial identification; (2) that the admission of inculpatory out-of-court statements allegedly made by the defendant's sister severely prejudiced the defendant so as to deny him

due process of law; (3) that the dropping of key issues by defense counsel due to the trial court's improper restrictions on cross-examination prejudiced the defendant so as to deny him fundamental due process of law; and (4) that the trial court committed reversible error by prohibiting admission before the jury evidence that tended to show the crime was committed by some person other than the defendant.

We affirm.

The day before the trial, the defendant made a pretrial motion to suppress any in-court identification by the State's eyewitnesses who testified at the preliminary hearing. A hearing was held on this motion, defendant being the only witness examined. He testified that he was in custody between January 1 and January 6, 1976, after which time he was bonded out. No lineups or other identification procedures were ever conducted. On February 10, the preliminary hearing was held. Defendant was sitting toward the front of the courtroom when his case was called with the words "People of the State of Illinois versus Curtis Ward." He then stepped forward toward the judge. His white lawyer stood beside him (the defendant is black). Vellen McCary, a witness, who heard the case being called, took the stand and identified the defendant as the assailant. Defendant further testified he had not known Vellen McCary prior to the February 10 hearing.

At the conclusion of defendant's examination, defense counsel made a motion to call Vellen McCary as a court's witness. The trial court denied the motion pending a showing of hostility, and defense counsel elected not to call him as a witness. A copy of the transcript of the preliminary hearing was then given to the court. After considering defendant's arguments that Vellen McCary's identification of defendant was unnecessarily suggestive and conducive to irreparable mistaken identification, the trial court denied the motion to suppress. Trial commenced the following day.

Vellen McCary, the State's first witness at trial, testified that on New Year's Eve, December 31, 1975, he was tending bar at the Dennison Legion Post, located at 1518 Wentworth, Chicago Heights. At about 1 a.m., Vellen came downstairs from the upstairs bar and spoke to Charles McCauley, the victim, at the door to the hall where Charles was collecting an entrance fee. Vellen then returned upstairs. When he came back downstairs for a short time later, he again conversed with Charles who pointed to a man who was wearing a floral print shirt. At trial, Vellen McCary identified the defendant, Curtis Ward, as that man. Vellen stated that he was facing Charles, and was positioned between Charles and the defendant within arms length of both of them, when the defendant reached over and behind Vellen, and shot Charles three times. The lighting conditions were fair and Vellen was able to see the defendant. There were lights at the door, and everyone who came in could be seen. Vellen added that although he was

not personally acquainted with the defendant, he had seen him many times during the preceding summer.

Vellen was permitted to testify over defendant's objections, that immediately after the shooting, a girl screamed, "Curtis, you shot him." The girl had been standing directly behind Vellen. At trial, Vellen identified Lisa Ward, the defendant's sister, as that girl. After the shooting, the defendant then ran out of the building and Vellen stepped out onto the sidewalk to follow him. The defendant stopped and faced Vellen, who was 30 feet distant, and fired at him twice. Vellen ran back into the building. Lighting conditions outside the building were fair. The next day Vellen went to the police station and identified defendant by picking out his picture.

Charles McCauley testified that earlier in the evening, the defendant had sought entry into the hall. Charles had told him it was a dollar to enter and the defendant turned around and walked out the door. At about 1:15 a.m., a girl identified as the defendant's sister, Lisa Ward, told Charles that her brother had gone to get a gun. At 1:30 a.m, the defendant returned and paid his fee. Charles noted that defendant was wearing a flowered shirt. The defendant and his sister remained near the door about 3 to 4 feet behind Charles, talking for about 20 minutes. When Vellen came downstairs, Charles told him what the girl had said. The girl then approached him from his side, and said, "He says you are the one that tore my coat." With that, Charles was shot from behind. He fell to the floor with his feet buckled beneath him. When he attempted to get up, he saw the man who had entered earlier standing in the door 6 to 8 feet away with a gun pointed at him. Charles McCauley identified the defendant, Curtis Ward, as this man. The defendant then fired his gun twice more, with one bullet hitting Charles. Charles testified that the lighting was "pretty great", and that if you had had sunglasses on, you would still have been able to see. He saw the defendant clearly. He had brought the image of his face to his memory many times since. He further stated that he had not known the defendant personally, but had seen him a number of times over the course of two years.

Police Officer Ronald Carter testified that he was on duty that evening and just prior to leaving for home, he responded to a radio call. When he arrived on the scene he saw Charles McCauley on a stretcher. He also saw Lisa Ward, whom he had known before this incident, at the scene. Over the defendant's objection, Carter was allowed to testify that he overheard Lisa tell a third person that "my Curtis" or "my baby brother" shot this man. Carter asked Lisa where her brother was now, and she said he was probably at home. He reported what she had said to his sergeant. Later, Carter and other officers went to the Ward residence which was 2½ blocks away. Lisa answered the door. On rebuttal, Carter was allowed to testify,

over defendant's objections, that he overheard Lisa tell her father, "Curtis shot another man, shot a man again."

Officer Stephen Nosal testified that he was part of the police investigation that night, arriving at about 2:30 a.m. He took photographs of the floor tile where a bullet hole was found. A part of a bullet and the floor tile were removed. He added that no other bullet casings were found in the hall.

Lisa Ward, the defendant's sister, testified on behalf of the defendant. She stated that she went to the hall on New Year's Eve about 9:30 or 10 p.m. At one point, a man informed her that she was wanted outside. There she saw the defendant, who asked her for money. The defendant then went north and she returned indoors. At midnight, she heard a dozen gunshots. At about 1 a.m., while she was sitting with her back to the door, she heard some more shots, fired in rapid succession. She denied that her brother was near her. When she turned around, she saw that there was a commotion with people pushing to get out. She saw the victim on the floor. Before leaving the hall, she made no statements. She denied saying, "My baby brother just shot a man, I hope he don't die." She left the hall alone and walked north a short distance to Kasak's, a tavern. Later, she went to her father's home. About 10 to 15 minutes after the shooting, some police officers arrived. She testified that Officer Carter asked, "Was it Curtis? They told me that it was Curtis that shot the man at the American Legion." Lisa Ward responded, "That's not true." She then told her father what Officer Carter had said.

The defendant, Curtis Ward, testified that he went to the hall about 10:30 p.m. to get money from his sister. He was inside the door when he was stopped by a man he did not know. He then sent a fellow in to get his sister. She came out. When he had finished his business, he went north. He bought cigarettes at a place called the Snack Bar, and also got change to play cards. He then went to his cousin's house where he met Ruthie Ward, Ollie Ward and Rosie Blackful. He played cards until 2 a.m., at which time he went to sleep. When he awoke, he found out that the police thought he was involved in a shooting incident at the hall. He went to the police station voluntarily. He denied that he shot anyone and denied that he owned or possessed a gun. Both Rosie Blackful and Ollie Ward corroborated the defendant's testimony.

Defendant first contends that Vellen McCary's identification of the defendant at the preliminary hearing was unnecessarily suggestive and conducive to irreparable mistaken identification, and that the trial court erred by failing to require the State to demonstrate an independent origin to the in-court identification.

The practice of showing suspects singly to witnesses for the purpose of identification, and not as part of a lineup, has been widely condemned

(*United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926; *Gilbert v. California* (1967), 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951; *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967; *People v. Stock* (1st Dist. 1973), 15 Ill. App. 3d 722, 304 N.E.2d 646). In effect, such a showup may say to the witness "This is the man." See *Foster v. California* (1969), 394 U.S. 440, 22 L. Ed. 2d 402, 89 S. Ct. 1127.

■■ Recognizing the possibility of mistaken identification resulting from the use of a one-man showup, Illinois courts have outlined certain specific circumstances under which this type of identification procedure might be justified: (1) where a hospital viewing was imperative because it was uncertain whether the victim would survive; (2) where the identifying witness had an excellent opportunity to observe the crime; (3) where the witness knew the person identified before the crime; (4) where uncommon distinguishing characteristics were the principal means of identification. *People v. McMath* (1970), 45 Ill. 2d 33, 256 N.E.2d 835; *People v. Hatcher* (5th Dist. 1977), 45 Ill. App. 3d 374, 359 N.E.2d 1157.

■■ Once the impropriety of an identification procedure has been shown, the State must prove by clear and convincing evidence that each witness' identification of the defendant had an independent origin and was not influenced by the unnecessarily suggestive procedure. (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152.) Some of the factors to be considered by the court are the length and the quality of the witness' opportunity to observe at the time of the crime; his degree of attention to the defendant; discrepancies or correspondences between any description given before the suggestive procedure and the defendant's actual description; any previous identification of another person; any prior identification of the defendant's photograph; the level of certainty demonstrated by the witness at the confrontation; and the lapse of time between the crime and the identification. (*Wade; Blumenshine; Hatcher.*) The ultimate question to be answered is whether the in-court identification is reliably predicated upon an observation independent of the challenged in-custody confrontation. (*People v. Triplett* (1970), 46 Ill. 2d 109, 263 N.E.2d 24.) With these guidelines in mind, we turn to an examination of the evidence.

Initially, although we note that while defendant contends on appeal that he was the only black male present in the courtroom at the time of the preliminary hearing, this contention is not supported by the record. At the hearing on the motion to suppress, defendant only testified that he stepped forward with his white lawyer when his name was called. But assuming, *arguendo*, that this confrontation was improperly suggestive, it is clear from the record that Vellen McCary's identification was based on an independent origin.

The preliminary hearing took place approximately 40 days after the

shooting. The transcript of that hearing reveals that Vellen McCary saw the defendant before the shooting when Charles McCauley pointed him out. At the time of the shooting, Vellen stated he was shoulder to shoulder with defendant when he saw defendant reach around him and shoot Charles. Following the shooting, Vellen testified he followed defendant as he ran out of the building. From 30 feet away, Vellen again saw defendant as defendant shot at him. Clearly, Vellen had ample time and opportunity to observe defendant before, during and after the crime.

Defendant points out that Vellen's description of the location of the parties during the shooting was contradictory and inconsistent. It is not unreasonable, however, to expect the relative locations of the parties to change while one party is attempting to shoot at another, and this would explain the discrepancies in Vellen's version of the shooting. More importantly, however, Vellen's testimony regarding the identification of defendant as the assailant was positive and certain.

■■ Finally, when certain other evidence produced at trial is considered, it is clear that Vellen's identification was based on an independent origin, and that the motion to suppress was properly denied. It is well settled that when considering the trial court's ruling on a motion to suppress, the reviewing court may look at evidence produced at trial even though it was received after the conclusion of the hearing on the motion to suppress. (*People v. Meacham* (3d Dist. 1977), 53 Ill. App. 3d 762, 765-66, 368 N.E.2d 400; *People v. Billings* (1st Dist. 1977), 52 Ill. App. 3d 414, 420-21, 367 N.E.2d 337.) At trial, Vellen testified that although he was not personally acquainted with defendant, he had seen him during the prior summer many times. Furthermore, Vellen had identified the defendant by photograph on the day following the shooting.

Defendant next argues that the admission of certain inculpatory out-of-court statements allegedly made by defendant's sister, severely prejudiced the defendant so as to deny him due process of law. The first statement of which defendant complains, was admitted into evidence over defendant's objection during the direct examination of Vellen McCary. He testified that after shots were fired, defendant's sister, Lisa Ward, cried out "Curtis you shot him." This statement was admitted under the spontaneous declaration exception to the rule against hearsay.

Before a statement can be admitted under the spontaneous declaration exception, three conditions must be satisfied: (1) the occurrence must be sufficiently startling to produce nervous excitement in the declarant, which renders the statement spontaneous and unreflecting; (2) there must be an absence of time between the occurrence and the statement in which the declarant could reflect and fabricate; (3) the statement must relate to the circumstances of the occurrence. (*People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804; *People v. Watson* (1st Dist. 1975), 28 Ill. App. 3d 786, 329

N.E.2d 512.) Clearly, Lisa Ward's statement at the time of the shooting satisfies all three conditions.

■■ The second statement defendant challenges was made by Officer Carter during the State's case-in-chief, and was also admitted into evidence over defendant's objection. Carter testified that he arrived at the scene some time shortly after the shooting occurred. Upon his arrival, he apparently overheard Lisa's answer to her boyfriend's query of what happened. Carter testified he wasn't sure, but he believed Lisa said that her Curtis or her baby brother shot this man. This statement should not have been admitted as a spontaneous declaration. The statement was not made at the time of the shooting or immediately thereafter, and the record is unclear as to whether Lisa was still in a state of excitement at this later time. (*People v. Jackson* (1st Dist. 1975), 26 Ill. App. 3d 618, 325 N.E.2d 450.) The statement is further suspect since it was neither directed to the witness, nor was the witness sure of the exact words Lisa used.

■■■ Similarly, Carter's later testimony that he heard Lisa tell her father, "Curtis shot another man, shot a man again," was also inadmissible hearsay. The State's argument that this testimony was properly admitted on rebuttal as a prior inconsistent statement to impeach Lisa's credibility, is without merit. An out-of-court statement may be used to cast doubt on a witness' credibility, but when it contains the dual purpose of tending to prove a defendant's guilt, it cannot be used. *People v. Allen* (1st Dist. 1976), 36 Ill. App. 3d 821, 344 N.E.2d 825.

■■ In spite of these errors, however, the evidence presented by other witnesses was overwhelming. Both Vellen McCary and Charles McCauley testified that they had seen defendant on prior occasions, although they did not know him personally. Both witnesses had ample opportunity to view defendant at close range at the time of the shooting, and their subsequent identifications of defendant as the assailant at trial were strong and positive. Further, in view of our position regarding the admissibility of Lisa Ward's spontaneous declaration at the time of the shooting, the subsequent statements attributed to her by Officer Carter were merely cumulative. Considering the evidence in its entirety, there is no reasonable possibility that the jury would have acquitted the defendant had the evidence complained of been excluded. As this evidence did not contribute to the defendant's conviction, its admission was harmless error. See *People v. Butler* (1978), 63 Ill. App. 3d 132, 379 N.E.2d 703, and *People v. Torres* (1st Dist. 1974), 18 Ill. App. 3d 921, 310 N.E.2d 780.

■■ Defendant next contends that the dropping of key issues by defense counsel due to the trial court's improper restrictions on cross-examination prejudiced the defendant so as to deny him fundamental due process. Specifically, defendant contends that (1) he was unable to impeach

Charles McCauley's testimony to the effect that Charles had previously stated that he had seen the defendant only one time prior to the night of the shooting; (2) he was not permitted to ask Charles whether he had previously made any other identifications, or whether the identification of defendant was suggested by any photographs shown to him by the police; and (3) he was not permitted to inquire into a conversation between Lisa Ward and the defendant, and to explore an earlier scuffle at the door which Lisa witnessed.

After examining the record, we note that some of the questions propounded by defendant on these subjects were objectionable on technical grounds, and were correctly sustained by the court. And although we agree with defendant that the line of questioning was proper, and that the court improperly sustained certain other objections of the State, the restrictions were not prejudicial since an examination of the total record clearly establishes that the defense did examine the witnesses concerning their ability to observe and identify the defendant. *People v. Attaway* (1st Dist. 1976), 41 Ill. App. 3d 837, 354 N.E.2d 448.

■■ Finally, defendant contends that the trial court committed reversible error by prohibiting admission of certain evidence that would tend to show the crime was committed by some other person than the defendant. (*People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590; *People v. Nitti* (1924), 312 Ill. 73, 143 N.E. 448; *People v. Jackson* (4th Dist. 1976), 37 Ill. App. 3d 279, 345 N.E.2d 509.) However, the evidence proffered in this case, that a large number of shell casings were found in the area by investigating officers, does not suggest that someone other than the defendant committed the crime. The trial court, therefore, did not err in refusing to admit defendant's proffered evidence.

Judgment affirmed.

STAMOS, P. J., and DOWNING, J., concur.