644 P.2d 280

**The STATE of Arizona, Petitioner,**

v.

**The Honorable William E. DRUKE, Judge of the Superior Court, Division XI, In and For the County of Pima, State of Arizona, Respondent,**

**and**

**Darrell Lawrence HAMMOND, Real Party in Interest.**

No. 2 CA–CIV 4319.

Court of Appeals of Arizona, Division 2.

Feb. 26, 1982.

Rehearing Denied April 8, 1982.

Review Denied May 4, 1982.

Stephen D. Neely, Pima County Atty. by John W. Dickinson and Clinton P. Stinson, Tucson, for petitioner.

Frederic J. Dardis, Pima County Public Defender by Michael J. Bloom and Lawrence H. Fleischman, Tucson, for real party in interest.

## OPINION

HATHAWAY, Judge.

The real party in interest, Darrell Hammond (Darrell), is the defendant in a pending prosecution for the murder of his mother and stepfather. Joey Hammond (Joey), the defendant's 12-year-old cousin, who was living in the victims' home at the time of the homicide, is to be a witness at trial by a videotaped deposition. The respondent court, pursuant to the defendant's motion in limine, has ruled that the prosecution is precluded from inquiring via impeachment about certain prior inconsistent statements made by Joey. The ruling applies to "any statements by Joey in which he says the defendant wanted to get rid of his parents; talked about shooting them or killing them; talked about it over a couple of days; his reasons for wanting to take their lives, such as 'to be free'; any attempts to convince Joey to go along with him, either in the plans to kill his parents or in the suggested cover-up by making the incident look like a burglary or a robbery."

The respondent court concluded that *State v. Cruz*, 128 Ariz. 538, 627 P.2d 689 (1981), mandated exclusion of these statements, which tended to prove the defendant's guilt. Since we do not agree that *Cruz* applies to the circumstances here and since the state has no remedy by appeal, we assume jurisdiction.

A brief summary of the facts is as follows. At approximately 2 a. m. on December 26, 1980, officers of the Tucson Police Department were summoned to the Hammond residence by Darrell, who stated on the phone that there had been a robbery at his home and that his parents had been shot. When the police arrived, they were again told by Darrell that his parents had been shot by a robber. He gave a tape-recorded statement to a police officer at that time. Joey was present in the house at the time of the shooting and he gave a taped statement to Detective Reuter at approximately 3:30 a. m. Joey recalled Darrell coming home at approximately midnight and discussing his girlfriend. Joey went to sleep and woke up to the sound of moaning and crying and he saw Darrell standing in the bedroom doorway with a shotgun. Darrell then fired the shotgun into the livingroom, striking the wall. Joey saw no one else in the house. He heard Darrell call the police.

Shortly thereafter, Darrell gave another taped statement to Detective Reuter. Initially, he adhered to his story about the robbery but then admitted shooting both his mother and stepfather. He claimed the shooting of his mother was an accident and that he had killed his stepfather in fear of what he would do when he awoke. Joey was taken to Casa de los Ninos and shortly before noon gave another taped statement. He indicated that he had not told all that had happened, that Darrell had in fact planned to kill his parents and make the

killing look like a robbery and that he had tried to get Joey to assist in the plot by enticing him with certain items of property. Joey's father then came to Tucson and took Joey to his home in Louisiana.

In mid-January 1981, Joey was returned to Tucson to testify at a juvenile court transfer hearing. Defense counsel waived the probable cause portion of the transfer hearing but interviewed Joey for an hour and 15 minutes. This interview was taped and the information given by Joey was consistent with his second statement of December 26.

Sometime after school ended in the spring, Joey and his father moved back to Saratoga Springs, New York. In August 1981, Joey called the public defender's office in Tucson and stated that he had lied in his former statement and that there was no preplanned robbery. Defense counsel traveled to New York and on the evening of September 24, 1981, took a taped statement from Joey. In that statement, Joey recanted his former statement about Darrell's threats, made on the night of the shooting, to kill his parents.

On January 19, 1982, Joey traveled from New York to Tucson pursuant to a subpoena to testify at trial. While he was en route to Tucson, the trial was continued and therefore the parties agreed to the preservation of his testimony in a videotaped deposition that would be played for the jury. Joey was briefly interviewed by the prosecutors in the early afternoon of January 19. This was not tape-recorded. Later that afternoon, he was interviewed by defense counsel as previously arranged. This statement was tape-recorded and Joey admitted that Darrell had talked about killing his parents that night when he got home and also stated that he was being pressured by the family. For three and a half days, commencing the afternoon of January 20, Joey testified on deposition and recanted all prior statements concerning Darrell's planning a robbery or threatening to kill his parents. He admitted having made the statements and attempted to explain why he made them.

In *State v. Cruz*, supra, the defendant's sister testified at trial and denied having told the victim's girlfriend that the defendant told her he was going to shoot the victim. Over the defendant's objection, the trial court allowed the victim's girlfriend to testify about a statement that the sister had allegedly made which repeated the inculpatory statement allegedly made by the defendant. In reversing, our supreme court stated:

"... [W]e have a statement which does more than merely impeach the witnesses' [sic] statement; rather, it relates directly to the guilt of the defendant. This presents a situation where the possibility of prejudice is inordinately high and the reliability of the statement requires resolution of a swearing contest between the declarant and the person to whom the statement was allegedly made. *United States v. Cunningham*, 446 F.2d 194, 198 (2d Cir. 1971), cert. den. 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266. Here, the alleged statement made by Viviana Cruz was especially prejudicial due to the fact that it contained an alleged admission by the appellant which, if believed by the jury, established the appellant's guilt. Even though an out-of-court statement may be used to cast doubt on a witness' credibility, when it contains the dual purpose of tending to prove a defendant's guilt, it should not be admitted. *People v. Ward*, 63 Ill.App.3d 864, 872, 20 Ill.Dec. 674, 680, 380 N.E.2d 883, 889 (1978); see also *United States v. Morlang*, 531 F.2d 183 (4th Cir. 1975). We feel such a limitation is necessary in light of the fact that impeachment evidence may be used substantively. *State v. Skinner*, 110 Ariz. 135, 515 P.2d 880 (1973)." 128 Ariz. at 540–41, 627 P.2d at 691–92.

The facts of the instant case are clearly distinguishable from those in *Cruz*. The only similarity is that Joey's prior statements tend to prove Darrell's guilt. However, unlike *Cruz*, the reliability of the prior statements does not require resolution of a swearing contest between Joey and the person to whom the statements were made.

**129**

Joey admitted having made the statements and thus it was for the trier of fact to decide which version of the events, as related by Joey, was true.

We believe the case of *State v. Acree*, 121 Ariz. 94, 588 P.2d 836 (1978), is controlling here. In *Acree*, the prosecution called the victim of the crime as a witness. In a tape-recording of an interview with her conducted by police officers two days after the incident, she had indicated that Acree pointed the gun at her and tried to shoot her. On the witness stand, however, she testified that Acree had never pointed the gun at her, that she did not believe he would have shot or harmed her and that she may have blown the matter out of proportion. The trial court permitted part of the tape-recording to be played to the jury. It represented the victim's account of the events leading up to and including the assault. Our supreme court upheld the admissibility of the tape-recording and its use substantively.[1]

The statements excluded by the respondent court in the instant case dealt with matters that could have been brought out by the state in its case in chief and thus did not constitute impeachment as to collateral or irrelevant matters. Therefore impeachment and cross-examination of Joey by the prosecution as to those prior statements would be proper. *State v. Acree*, supra.

The order of the respondent court precluding the state's inquiry as to certain prior statements of Joey's is vacated and set aside.

HOWARD, C. J., and BIRDSALL, J., concur.

---

1. We note parenthetically that the cases relied upon in *Cruz* arise in jurisdictions which do not permit the use of prior inconsistent statements substantively; therefore the prosecution is precluded from using prior statements that tend to establish the defendant's guilt under the guise of impeachment.