THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* .THOMAS SMALLEY, Defendant-Appellant.

First District (5th Division)   No. 82—1334

Opinion filed February 24, 1984.

Steven Clark, of State Appellate Defender's Office, and Eileen J. Furey, of Schiff, Hardin & White, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Edward Barron, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:

Following a bench trial, defendant was convicted of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)) and sentenced to 30 years in the Department of Corrections. On appeal, defendant argues that he was denied his constitutional right to effective assistance of counsel. For the following reasons, we affirm the judgment of the trial court.

The record reveals the following pertinent facts. Approximately 9 p.m. on May 20, 1981, Darryl Adams was shot and killed while running across a crowded playground between two apartment buildings located on South State Street in Chicago. Testimony presented two versions of the events leading up to and including the shooting.

First, Joyce Hughes testified that while she was sitting on a playground bench with two girl friends, she noticed Darryl Adams standing about 20 feet from her talking to another black male whom she did not know. She then saw the second man fire one shot at Darryl, followed by several more aimed at Darryl's back as he fled toward the building at 4845 South State.

On cross-examination, Hughes stated that Darryl was on a bicycle, facing the bench on which Hughes was sitting and the second man had his back to her. She did not see anyone else join the conversation.

David Bush testified to substantially the same occurrence facts as did Hughes but added that he did have an opportunity to view the assailant's profile which enabled him to pick out defendant's photo from a photo array at police headquarters on the night of the shooting and also to identify defendant as the assailant at trial.

Cornell Cousins then testified that approximately 9 p.m. on the

night of the shooting he was standing on the ground floor at 4845 South State when he heard a gunshot, stepped out of the building corridor and looked toward State Street where he saw defendant shooting at Darryl Adams as he chased Darryl across the playground. On cross-examination, Cousins stated that he had been with his friend, Earl Norwood, five minutes before the shooting and later left with Norwood to get a beer. Norwood had not been with his girl friend. Cousins also admitted to knowing Tom Singleton.

Next, Earl Norwood testified that at the time of the shooting, he and his girl friend were sitting on the seventh floor porch of the building at 4844 South State when he heard gunshots coming from the direction of the 4848 building. When he looked down, he saw defendant shooting at Darryl as they were both running across the playground. On cross-examination, Norwood stated that he had been sitting on the porch for approximately two hours when the shooting occurred. He had had no plans to meet Cornell Cousins later that evening. The 4844 building is located approximately 75 to 100 feet from the 4848 building, and defendant came as close as 50 feet to the 4844 building while he was running. Thereafter, the State rested its case and the court denied defendant's motion for a directed finding.

Following the testimony of several defense witnesses, defense counsel requested that the case be either passed or held over pending the arrival of two additional defense witnesses, Tom Singleton and Maurice Norris. In response to the trial court's query as to whether their testimony would be germane to the case, defense counsel explained that Singleton would testify that Cousins told him that he had not seen the shooting. When the court noted that defense counsel had not laid a proper foundation for impeachment of Cousins, the following colloquy ensued:

"DEFENSE: Well, I don't think Mr. Thomas Smalley, in a case as serious as this, should be punished for the incompetency of his lawyer, Judge.

COURT: The difficulty I am having *** is how to rectify the situation.

DEFENSE: I could get a subpoena out to Cousins today and have him brought back at the Court's convenience to reopen cross-examination.

COURT: For this limited purpose?

DEFENSE: For that limited purpose.

COURT: Does the State have any means of bringing Mr. Cousins back, other than subpoenaing him?

STATE: No, Sir.

* * *

COURT: *** I will put this case over until Monday. If Mr. Cousins is present, I am going to allow you to reopen your cross-examination for the limited purpose of confronting him with this evidence. If you are at that time in a position to complete the impeachment, then [the motion to strike the impeachment testimony] would be denied. I don't know what else I can do for you."

When trial resumed the following Monday, defense counsel requested a side bar during which she informed the court that Norris and Singleton were in the jury room and expressed fear about testifying in front of the victim's family who was in the courtroom. In fact, Norris had had a rock thrown at him within the last few days. Defense counsel further stated that she had been told that Cousins had received the subpoena and was going to be in court that day, but she had not yet seen him. Defense counsel then made the following request of the court:

"I am making a request and if it is unorthodox, either have the proceedings in chambers or the jury room. I don't know how you can ask the public to leave the courtroom.

I don't know how it can be done. I would hate to see them controlling the trial."

In response, the State argued that defense counsel's fears were "just bold accusations." The court then queried defense counsel as to her inability to produce Cousins for purposes of laying a foundation for impeachment. Acknowledging that Cousins had failed to appear, defense counsel requested leave to have the impeachment testimony taken with its admission subject to Cousins' later appearance. The court agreed.

Tom Singleton then testified in open court that although he had not seen the actual shooting, he had heard the shots and had run to the scene. When Singleton denied ever having overheard any statements made by Cousins regarding his appearance at the preliminary hearing, defense counsel requested a side bar during which she informed the court as to the following:

"The witness had been to court two or three times. The first time was a month and a half or two months ago. He told me two or three times that he was in the lot playing ball with the team and Cornell Cousins, who was a spectator, made the comment after he testified against Thomas Smalley at the preliminary hearing he was the only one called or the only one that came to the preliminary hearing.

He said in front of Mr. Singleton that he shouldn't be going because he didn't know nothing about it and it isn't right that you should do this to friends or conversation that he'd have to use, his own words."

Defense counsel also reiterated Singleton's fear about testifying in front of the victim's family.

When questioning resumed, Singleton admitted having met defense counsel previously, but denied having had any conversations with her about this case. Defense counsel then rested her case and the proceedings were continued to the following day.

When proceedings commenced, defense counsel requested that the case be reopened to allow defendant to testify, whereupon defendant testified that he was aware of the charges against him, and denied shooting Darryl Adams. On cross-examination, defendant stated that he was arrested while in Cook County Hospital where he was being treated for a gunshot wound incurred in an unrelated incident. Defendant then proceeded to give his version of the events leading up to and including the shooting. Approximately 8:45 p.m. on the evening of the occurrence, defendant rode a bicycle to 51st Street to get some ice. He returned within 10 minutes and was talking to White Cloud when Darryl Adams walked up to them and started arguing with defendant about the bicycle. Darryl was shot while he was running from the area where defendant was standing. Defendant left the area immediately after the shooting, exiting through the breezeway of the 4844 building.

On redirect, defendant denied that he was carrying a gun and stated that he immediately left the scene of the shooting because he was on parole and did not want to get involved. When interviewed by the police while he was in Cook County Hospital, defendant told the police that White Cloud, leader of the Disciples gang, shot Darryl. Prior to the night of the shooting, defendant had never seen Darryl.

Upon query by the court, defendant further explained that just prior to the shooting, he was riding a bicycle through a building breezeway when he was flagged down by White Cloud, whose real name is Sammie. As they were talking, Darryl Adams walked up and asked defendant where he got his bicycle. When defendant told him that Maurice Norris had given it to him, Darryl started arguing that it was his. At that point, White Cloud told Darryl to leave or he would get hit in the head with something and then proceeded to pull a .22 pistol out of his vest pocket. Darryl continued to taunt White Cloud and when he tried to reach for the gun, White Cloud fired. Darryl then turned and ran across the playground with White Cloud in

pursuit, firing at Darryl's back. On recross, defendant stated that he did not know the whereabouts of White Cloud. Following closing arguments, the court recessed for consideration of the evidence.

Prior to rendering its decision, the trial court made several pertinent comments on the evidence, noting that identification witnesses David Bush and Earl Norwood were credible and that Cornell Cousins, the most important State witness, was highly credible. The court further noted that Joyce Hughes' testimony contradicted defendant's statement that there was a third person present when he was talking to Darryl and that no evidence was introduced to corroborate defendant's version of the events. Finally, acknowledging that the case was "difficult," the court found defendant guilty of murder and entered judgment on the finding.

Thereafter, defendant filed a post-trial motion, alleging that: (1) he was denied effective assistance of counsel; (2) the finding was against the manifest weight of the evidence; and (3) he was not found guilty beyond a reasonable doubt doubt. At the post-trial hearing, defense counsel was granted leave to amend the motion, adding an allegation of newly discovered evidence and deleting the allegation regarding ineffective assistance of counsel. With respect to the newly discovered evidence, defense counsel argued that: (1) Joyce Hughes was the girl friend of the victim's brother and possibly the mother of his children, thus establishing bias against defendant; (2) the Disciples gang did not want a member of their own gang arrested, so members testified against defendant; (3) Earl Norwood's sister would testify that Earl was at his mother's on the night of the shooting; and (4) Brenda, one of the women sitting on the park bench with Joyce Hughes, would testify differently than did Hughes regarding the occurrence. In denying the motion, the court addressed both of defense counsel's general arguments: reasonable doubt and newly discovered evidence, stating that it remained satisfied beyond a reasonable doubt of defendant's guilt and that the newly discovered evidence did not satisfy the standard for a new trial set forth in *People v. Ramos* (1980), 80 Ill. App. 3d 722, 725, 400 N.E.2d 676. Defendant's timely appeal followed.

OPINION

■ The sole issue before this court is whether defendant received effective assistance of counsel. Initially, we note that issues raised for the first time on appeal, such as the one at bar, are generally waived. (*People v. Thomas* (1983), 116 Ill. App. 3d 216, 220, 452 N.E.2d 77.) The exception to this common law rule is Supreme Court Rule 615(a)

(87 Ill. 2d R. 615(a)), commonly known as the "plain error rule" which allows the reviewing court, in its discretion, to rule on plain errors or defects which affect substantial rights. It is our opinion that the issue of incompetency of counsel, especially in a criminal action, rises to the level of plain error and as such we take cognizance of the issue presented.

■ The governing standard for determining incompetency of counsel, court-appointed or privately retained, is whether the alleged incompetence produced substantial prejudice to the defendant without which the result would probably have been different. (*People v. Royse* (1983), 99 Ill. 2d 163, 457 N.E.2d 1217.) Collaterally, defendant is entitled to competent, not perfect representation and, in the absence of a demonstration that the outcome of a new trial would probably be different, the constitution does not require a new trial for every defendant whose counsel errs at trial. *People v. Greer* (1980), 79 Ill. 2d 103, 121, 402 N.E.2d 203.

■ Defendant argues that based upon the aforementioned incompetency standard, he is entitled to a reversal of his conviction or, in the alternative, a new trial. Specifically, he cites four general instances which allegedly demonstrate defense counsel's incompetence. First, defense counsel failed to conduct an adequate pretrial investigation of potential defense witnesses. Defendant makes particular reference to Earl Norwood's sister and a woman named "Brenda," a friend of Joyce Hughes. After the close of trial, defense counsel had moved for a new trial based on discovery of these witnesses, alleging that their testimony might lead to a different result. Defendant argues that failure to discover these witnesses before or during trial reflected a lack of diligence and inadequate preparation. Apparently the State assumes that the witnesses were readily available. Yet there is no evidence to support that assumption. More importantly, there is nothing in the record to indicate that no attempts were made by defense counsel to locate these witnesses prior to or during trial. Thus, because defendant's allegation is based solely upon conjecture, it provides insufficient grounds to warrant reversal or a new trial. (*People v. Witherspoon* (1973), 55 Ill. 2d 18, 22, 302 N.E.2d 3.) Furthermore, it is our opinion that the record contradicts defendant's allegation of a general lack of diligence during the pretrial investigation. For example, prior to trial, defense counsel requested several continuances in an effort to locate additional witnesses, and she amended her answer on two occasions to add critical witnesses. Moreover, considering the obstacles presented by nicknames and gang loyalty, any difficulty in locating witnesses cannot reasonably be considered proof of lack of

diligence.

In addition, there has been no conclusive showing of a prejudicial effect from defense counsel's failure to elicit the testimony of the two newly discovered witnesses. Based on the facts before us, the allegation that Earl Norwood's sister would testify that he had been having dinner with his mother the night of the shooting does not preclude the possibility that Norwood could have seen the shooting. We have no information as to where his mother lived or at what time Norwood allegedly ate dinner with her. Further, contrary to defendant's paraphrase of defense counsel's remarks, there was no allegation that Brenda's testimony would corroborate defendant's version. Defense counsel merely stated that Brenda's testimony would be "different" from that of Hughes. Likewise, there was no indication that Brenda's testimony would impeach the credibility of Joyce Hughes. "Different" is not synonymous with "contradictory."

As support for her allegation of incompetency by lack of diligence, defendant relies upon *People v. Stepheny* (1970), 46 Ill. 2d 153, 263 N.E.2d 83, *People v. Witherspoon* (1973), 55 Ill. 2d 18, 302 N.E.2d 3, and *People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203. We find these cases unpersuasive of defendant's position for several reasons. First, contrary to defendant's interpretation of *Stepheny*, that case did not hold that "failure of defense counsel to interview potential witnesses constitutes ineffective assistance of counsel." In fact, this was not even the issue before the *Stepheny* court. Instead, the court was asked to review the dismissal of defendant's petition for an evidentiary hearing on the question of inadequate representation. The court concluded that the petition was sufficient to entitle defendant to the hearing and the cause was remanded. Second, *People v. Witherspoon,* which addressed the question of whether a certificate attesting to good faith efforts must be filed by appointed counsel, is factually distinguishable from the situation at bar. Finally, we find *People v. Greer* more favorable to the State than it is to defendant on the ground that the *Greer* court emphasized the requirement of prejudicial effect in charges of incompetency, a requirement clearly not met in the present case.

■ The second instance of incompetency cited by defendant is defense counsel's failure: (1) to impeach the testimony of Joyce Hughes with a statement she gave to the police; (2) to establish Hughes' bias against defendant; and (3) to point out inconsistencies in her eyewitness account. The police record indicates that Hughes stated that she was sitting on a park bench with four other women. At trial, she stated that she was with two of her girl friends, omitting reference to

the other two women who were Hughes' sister and the victim's sister. Defendant claims that defense counsel's failure to note this discrepancy coupled with her failure to query Hughes about her obvious close friendship with the victim's sister resulted in the exclusion of "potentially serious impeachment evidence." Not only do we find defense counsel's failure to note the discrepancy inconsequential to the outcome of the trial, we also fail to see how sitting on a park bench with someone in a crowded playground on a warm, spring night is indicative of the "close" friendship defendant suggests. Further, even if Hughes were a friend of the victim's sister, we do not see this as a motive for convicting the wrong person of his murder. In fact, the opposite conclusion would be more likely.

Defendant further argues that defense counsel should have questioned Hughes about the factual inconsistency in her testimony regarding the fact that she was not able to see the assailant's face, yet she was able to see him put the gun into his pocket and walk away. Defendant suggests that this is improbable and that Hughes was unwilling, not unable, to identify defendant as the assailant. We find defendant's conclusion to be merely a speculative interpretation of what he thinks Hughes could see. Other interpretations are equally viable. For example, the assailant could have had his back to Hughes and put the gun into a side pocket, which she could have seen very easily. In our opinion, the only reason defense counsel failed to note this inconsistency was because no inconsistency existed.

■ The third instance of incompetence alleged by defendant is defense counsel's decision to put defendant on the stand. In this regard, defendant points out that the testimony elicited from him on direct was nothing more than his name, current address, whether he was aware of the charges brought against him, whether he knew the victim, and whether he had shot the victim. By contrast, he was subjected to a "scathing" cross-examination. The decision to put a defendant on the stand is clearly a matter of defense counsel's trial tactics and, as such, is not reviewable. (*People v. Witherspoon* (1973), 55 Ill. 2d 18, 22, 302 N.E.2d 3.) Furthermore, notwithstanding the fact that defense counsel could have believed that defendant's demeanor on the stand would bolster his credibility, the majority of the evidence elicited during cross-examination was in the record and could have been easily reviewed by the trial court whether defendant took the stand or not. Any irrelevant or incompetent evidence which may have been elicited and did not otherwise appear in the record is presumed not to have been considered by the trial court. (*Cook County Department of Environmental Control v. Tomar Industries* (1975), 29

Ill. App. 3d 751, 755, 331 N.E.2d 196.) Further, we do not agree that defense counsel's failure to object to scope or relevancy during the cross-examination resulted in any prejudice to defendant. Neither do we find defendant's reliance on *People v. Gardiner* (1922), 303 Ill. 204, 135 N.E. 422, persuasive on this point. *Gardiner* involved a jury trial during which the cross-examination focused extensively on defendant's moral character and matters wholly foreign to the issue before the court. None of these determinative elements is present in the case at bar.

The final instance of alleged incompetence is defense counsel's failure to lay the foundation for seriously impeaching testimony. Before applying the incompetency standard to the facts pertinent to this allegation, it is imperative that we correct several misstatements made by defendant in his brief. Defendant argues: "At some point late in the trial, the Public Defender learned that, shortly after testifying, Mr. Cousins told a number of persons that he had no business testifying in court against Mr. Smalley ***. The Public Defender asked leave of court to bring in two witnesses who would testify to Mr. Cousins' statements." The witnesses referred to by defendant are Maurice Norris and Tom Singleton. First, there was only one impeachment witness and that was Tom Singleton. While it is true that both Norris and Singleton expressed fear at testifying in front of the victim's family, only Singleton had allegedly overheard Cousins' remarks. Second, neither witness was discovered "late in the trial." Norris' name appeared in defendant's answer to discovery as early as October 30, 1981, approximately five months prior to trial, and Singleton was added one month prior to trial.

■ Defendant contends that defense counsel's failure to lay the foundation to impeach Cousins seriously prejudiced his case because the trial court considered Cousins to be the State's most important witness. Unquestionably, the record reveals several instances where defense counsel erred in her attempt to impeach State witnesses. She appeared particularly confused about when and how to lay a foundation for impeachment. However, as previously noted, a defendant is entitled to competent, not perfect, representation, and in order to establish incompetence, substantial prejudice must be shown. (*People v. Greer* (1980), 79 Ill. 2d 103, 121, 402 N.E.2d 203.) Because it was never conclusively established that Singleton's testimony would impeach Cousins, the necessary prejudice was never shown. In fact, defense counsel's error in failing to lay a foundation became a moot issue as a result of Singleton's subsequent denial that he had ever overheard Cousins state that he had not actually seen the shooting.

Defendant argues that Singleton testified as he did because of defense counsel's failure to pursue her request that Singleton be allowed to testify outside the presence of the spectators. Once again, this is only speculation on defendant's part and, as such, is insufficient to warrant reversal or a new trial. (*People v. Witherspoon* (1973), 55 Ill. 2d 18, 22, 302 N.E.2d 3.) Accordingly, because there is no evidence of prejudice to defendant from defense counsel's failure to lay a foundation for impeachment, we decline to find such an error indicative of incompetency.

In summary, we conclude that defendant has not shown that defense counsel was actually incompetent. Despite defense counsel's confusion regarding impeachment testimony, the record shows no prejudice resulted to defendant and that, overall, defense counsel represented her client vigorously, and to such a proficient degree as to preclude a finding of incompetency.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

MEJDA, P.J., and SULLIVAN, J., concur.