THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHRIS ROGERS, Defendant-Appellant.

Second District   No. 84—0265

Opinion filed February 27, 1986.

G. Joseph Weller and Michael F. Braun, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (Phyllis J. Perko and Andrea Becker, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE STROUSE delivered the opinion of the court:

The defendant, Chris Rogers, was charged in a two-count indictment with the murder of Brenda Almanza in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (2)). Following a jury trial, he was convicted of murder and sentenced to an extended term of 55 years' imprisonment. Defendant appeals from the judgment of conviction and sentence.

The relevant facts reveal Glen Ellyn police officer Roger Lilly found Brenda's car in the parking lot of an apartment complex located across the street from the College of Du Page. Brenda had been missing since she left the college at 9:30 p.m. the night before. The passenger side window was shattered and there were five holes in the interior of the passenger door. Brenda's body was found in the trunk. The autopsy revealed that she had been shot five times and died from internal bleeding caused by the shooting.

On April 13 and 14, Laurie Moake and Arlene Grosso, who both

worked at the apartment complex where Brenda's car and body were found, received two telephone inquiries concerning the location of the car. They then contacted the police and consented to having a wire tap placed on their phone. The first recording was made around 12:30 p.m. on April 14, 1983. The police told Moake and Grosso to tell the caller that the car had been towed to Midwest Auto. The recorded telephone conversations were later played during defendant's police interrogation and during the trial.

After defendant's arrest, he filed a number of motions, including, "Motion to Suppress Eavesdropping Recordings and Fruits Thereof," and "Motion to Suppress Confessions and/or Admissions."

Du Page County Circuit Court Judge Charles Norgle testified at the hearing on the motion to suppress eavesdropping recordings that on Saturday, April 16, 1983, he received a call at his home from Assistant State's Attorney Peter Dockery concerning an eavesdropping order. The judge had no personal recollection of the substance of their conversation, but remembered telling Dockery that there was a sufficient basis for approving the emergency use of an eavesdropping device and that Dockery should bring the "proper document" to Norgle's courtroom on Monday. No notes were made of this telephone conversation. Dockery was not asked to swear to his representation made over the telephone.

Judge Norgle also stated that while he had no independent recollection as to the time he gave oral approval for the eavesdropping device on Saturday, April 16, the notice he signed on Monday, April 18, put the time he gave oral authorization as being 12:20 p.m. on April 16.

Assistant State's Attorney Dockery testified that on April 16, he received a call from Police Chief James Mullaney around 10 a.m., who related the facts about the murder investigation including the tape recorded telephone conversations at the apartment complex where the car and body were found. Dockery then called Assistant State's Attorney Thomas Knight, who told him that the period during which judicial approval had to be obtained was about to expire. Dockery then attempted to contact several judges to obtain approval and around 12:15 p.m. reached Judge Norgle. The remainder of his testimony corroborated that of Judge Norgle's.

Knight also testified at the motion that police officer Robert Velon contacted him around noon on Thursday, April 14, and told him that the apartment complex had received phone calls from one caller who had been asking about Brenda's car. Knight did not speak to Dockery until Saturday, April 16.

On Monday, April 18 at 1:30 p.m., Judge Norgle started his court call. At 2 p.m., the State's witnesses appeared, and, Knight, Velon, Laurie Moake and Arlene Grosso swore before Judge Norgle that the information in their affidavits was true. The judge entered an order at 2:23 p.m. approving the use of the eavesdropping device.

After hearing argument, the court noted the "strong public policy" that eavesdropping would not be tolerated unless it was approved by the court pursuant to statute. The court continued that while "there is some lack of memory and some slight dispute as to the exact time sequence involved," the oral application was made 10 minutes before the expiration of the 48-hour time limit imposed by statute. The court concluded that the failure to file a written application did not violate the spirit and intent of the statute to warrant suppression.

Dr. Lyle Rossiter, a psychiatrist, who examined defendant on the day of his arrest at the assistant State's Attorney's request, testified at the motion to suppress admissions. His interview of defendant, which lasted an hour and a half, revealed that defendant looked chronically depressed and weary. Rossiter testified further that defendant's answers to his questions were relevant and coherent and that he appeared alert and well-oriented. Rossiter determined that defendant's moderate depression could be a symptom of a number of mental illnesses, but he did not determine whether there was any indication of a psychosis, neurosis, or personality disorder. Such a determination would require more examining and testing. However, Rossiter did not detect anything that would impair defendant's ability to understand his rights.

Dr. Robert McFarland, a clinical psychologist, administered a number of tests to defendant during three sessions totalling 6½ hours. As a result of these tests and a review of defendant's record, McFarland concluded that defendant had borderline intellectual functioning. Defendant's IQ was 74, which placed him in the bottom 3 or 4% of the population. McFarland concluded that defendant was unable to intelligently exercise his *Miranda* rights. In reaching his opinion, defendant was given three tests personally devised by the doctor to assess defendant's understanding of his *Miranda* rights. Defendant received a score of 21 out of 40 points in defining 20 words taken from the *Miranda* warnings. On the second test, defendant was able to explain each *Miranda* sentence without difficulty. Only on the third test, in which defendant was asked to explain the implication of the *Miranda* principles, did the psychologist feel that defendant's answers were unsatisfactory.

Officer Mullaney testified that he advised defendant of his *Miranda* rights at the time of his arrest. Defendant told Mullaney that he understood his rights.

Officer Velon also testified that during his questioning of defendant, he appeared nervous but was cooperative. Velon believed that defendant was able to answer all the questions that were asked.

The defendant, who was 22 years old at the time of his arrest, also testified at the hearing. He had completed three years of high school and further technical training and had been employed as a machine operator for four years. He testified to the events leading up to the arrest, the arrest itself, and the interrogation. Defendant stated that Officer Velon played the tapes of the telephone conversations. He could not recall whether he told Velon that his gun discharged hitting Brenda or whether it was an accident. He did remember that Velon had written on a napkin that the shooting was an accident.

The interrogation lasted approximately seven hours. There was no evidence introduced that revealed any misconduct of physical or mental coercion during defendant's questioning.

The court denied the defendant's motion, finding that he had the intellect to voluntarily make a statement and that his statement was voluntary. The court also noted that while the tapes played some part in obtaining a statement from defendant, the court did not know the exact role they played.

At the conclusion of the jury trial, the defendant was found guilty of murder. Thereafter, the court imposed a sentence of 55 years' imprisonment.

Defendant first argues that the application for judicial approval of the emergency eavesdropping device violated section 108A—1 *et seq.* of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1981, ch. 38, par. 108A—1 *et seq.*). As a result of this, defendant contends that suppression of the recordings and all the evidence derived therefrom is required. The State contends that suppression should be granted only where judicial approval for prior emergency eavesdropping is denied and that suppression is not warranted as the violation, if any, was only technical.

Section 108A—6 of the Code provides that an investigative or law enforcement officer, upon approval of a State's Attorney, may use an eavesdropping device in an emergency situation. (Ill. Rev. Stat. 1981, ch. 38, par. 108A—6(a).) "[A]n application for an order approving the *** use of an eavesdropping device must be made within 48 hours of the commencement of such use." (Ill. Rev. Stat. 1981, ch. 38, par. 108A—6(b).) Neither party has questioned whether an emergency situ-

ation existed here. Rather, defendant contends that section 108A—3(a) (Ill. Rev. Stat. 1981, ch. 38, par. 108A—3(a)), which requires that an "application for an order \*\*\* subsequently approving the use of an eavesdropping device shall be made in writing upon oath or affirmation to a circuit judge," was violated when the application was made orally and not under oath or affirmation within the prescribed 48 hours.

There are no Illinois cases interpreting section 108A—3(a) concerning the writing and oath or affirmation requirements for eavesdropping applications. (Ill. Rev. Stat. 1981, ch.. 38, par. 108A—3(a).) However, cases that have addressed other areas of the statute have held that even though the eavesdropping statute is to be strictly construed (*People v. Monoson* (1979), 75 Ill. App. 3d 1, 5-6), not all statutory violations require suppression (see *People v. Sylvester* (1980), 86 Ill. App. 3d 186, 191-93; *People v. Ellis* (1984), 122 Ill. App. 3d 900, 904). Suppression is required if there is a failure to satisfy any of the statutory requirements which directly and substantially implement the legislative intent to limit the use of eavesdropping procedures. *People v. Nieves* (1982), 92 Ill. 2d 452, 458; *People v. Sylvester* (1980), 86 Ill. App. 3d 186, 192.

■ Both defendant and the State argue that where there is a failure to comply with statutory requirements, suppression depends upon whether there is a sufficient excuse or whether: (1) the particular safeguard is central to the legislative scheme of preventing abuses; (2) the purpose the particular procedure was designed to accomplish has been satisfied despite the error; and (3) the statutory requirement was deliberately ignored and, if so, whether the State gained any tactical advantage thereby. (*People v. Nieves* (1982), 92 Ill. 2d 452, 463 (where the court held that suppression of the recorded conversations was not required, even though the "immediate" sealing requirement of section 108A—7(b) was not turned over to the judge until 16 days after the eavesdropping order expired).) While *Nieves* dealt with the post-interception requirements of 108A—7(b) and motion to suppress under 108A—9, we find that *Nieves* and the reasoning therein is applicable to this case.

Within the 48-hour period, shortly after noon on Saturday, the State's Attorney's office reached a circuit judge, who is required for approval, after attempting to locate several other circuit judges. All the facts and circumstances surrounding the emergency wire tap were reviewed by the judge, who found there was a sufficient basis for approving the use. Judge Norgle, because he was not at the courthouse, told the assistant State's Attorney to bring the appropriate pa-

380

perwork, in accordance with the facts presented, to court for formal approval on Monday, at the first available court time. Formal approval was thereafter made after presentation of a written, verified application, affidavits, witnesses, and a proposed order. The evidence was substantially the same as that presented orally on the preceding Saturday. The order was then signed. It is clear that the difficulty in reaching a circuit judge on a Saturday, when the 48-hour time limit would expire, was a sufficient excuse for the practice here. It is also clear the requirement that a judge independently approve the emergency use was accomplished within the time required by law, although it was not made in writing.

Moreover, it is patently apparent that the statutory requirements were not deliberately ignored. In fact, the State made every effort to comply with the statutory safeguards and gained no tactical advantage thereby. The statutory purpose of the 48-hour approval is to guarantee prompt and proper judicial review to prevent abuses. Under these circumstances, the evidence reveals that statutory safeguards were satisfied and the legislative purpose was preserved. Therefore, the trial court correctly denied suppression.

Defendant next contends that his statement should be suppressed because his low intelligence, emotional problems, and lack of prior contact with the police rendered him incapable of knowingly and intelligently waiving his *Miranda* rights.

■ ■ It is true that factors such as age, intelligence, prior experience with the law, and emotional stability should be considered when determining whether a statement was voluntarily made. (*People v. Stone* (1978), 61 Ill. App. 3d 654, 659.) However, subnormal mentality does not, itself, make a confession involuntary as long as the subnormality has not deprived the defendant of his capacity to understand the meaning and effect of the warning. (*People v. Hester* (1968), 39 Ill. 2d 489, 500; see also *People v. Murphy* (1978), 72 Ill. 2d 421, 437.) Further, voluntariness is determined from the totality of the circumstances including not only the characteristics of the accused but also the details of the interrogation. (*People v. Hester* (1968), 39 Ill. 2d 489, 502; *People v. Turner* (1973), 56 Ill. 2d 201, 206-07; *People v. Stone* (1978), 61 Ill. App. 3d 654, 660-61.) In making its decision, the trial court need not be convinced beyond a reasonable doubt; it is sufficient to show by a mere preponderance of the evidence. The finding that the statement was voluntary will not be disturbed unless contrary to the manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 70; *People v. Baker* (1973), 9 Ill. App. 3d 654, 659.

■ In this case, standard psychological tests, a social history and

opinions as to defendant's emotional stability were admitted into evidence during the suppression hearing and at trial. (See *People v. Caballero* (1984), 102 Ill. 2d 23, 36 (evidence introduced at trial may also be examined to determine whether denial of a motion to suppress may be sustained on appeal).) It was found that defendant, who was 22 years old at the time of the crime, had an IQ of 74, had completed four years of high school and further technical school training, and had been employed for three years as a machine operator. Defendant did not exhibit any inability to comprehend English and was articulate when testifying.

Dr. McFarland was of the opinion that defendant did not understand his rights. However, he also testified that he questioned whether an IQ of 74 was an accurate reflection of defendant's intelligence because he had not detected the type of intellectual dullness associated with that level of IQ. Dr. Rossiter, who interviewed defendant on the same day that defendant was interrogated, testified that, in his opinion, defendant was able to understand his rights. He further found no evidence of a psychiatric disorder that would impair defendant's ability to understand the implications of the statements defendant made to the police.

Additionally, the evidence does not reveal that an abusive atmosphere existed during the police interrogation. Defendant had been advised of his rights on numerous occasions, and there was no evidence of physical or mental coercion that would render defendant's statement involuntary.

An experienced trial judge evaluated all of the evidence presented on this question. He had the opportunity to personally observe the defendant during the proceeding. (See *People v. Padilla* (1979), 70 Ill. App. 3d 406, 411.) We find that the court had an adequate factual basis upon which to find that defendant voluntarily and knowingly waived his rights under *Miranda* and thus, his motion to suppress was properly denied.

Defendant's final contention on appeal is whether the trial court abused its discretion in imposing a sentence of 55 years' imprisonment. Defendant claims that the sentence was improper in that the court inadequately considered mitigating and rehabilitative factors such as defendant's lack of a prior criminal record, steady employment history, psychological problems, and a supportive family. Defendant further maintains that the court made inconsistent findings regarding whether the murder was premeditated and therefore it was impossible to determine the basis for the court's sentence.

A sentence will be reduced by a reviewing court only where it

constitutes a substantial departure from the law and is an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153; *People v. Lloyd* (1981), 92 Ill. App. 3d 990, 993.) The trial court's judgment is given great weight and deference because it is in the best position to make a reasoned judgment as to a sentence which balances the need to protect society and to rehabilitate the offender. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93.) A reviewing court will not substitute its judgment merely because it might have balanced the sentencing factors differently if the task had been given to it. *People v. Cox* (1980), 82 Ill. 2d 268, 280.

Although rehabilitation is a factor which must be considered, it is not the only factor and does not outweigh other considerations which are persuasive of a severe sentence. (*People v. Watson* (1982), 107 Ill. App. 3d 691, 697.) Moreover, commission of a premeditated murder is a matter which supports a sentence greater than what otherwise might have been merited. *People v. Miller* (1974), 21 Ill. App. 3d 762, 768; compare *People v. Viser* (1975), 62 Ill. 2d 568, 586-87.

The record shows that the trial judge adequately considered and made consistent findings that the murder was premeditated. Moreover, in imposing the sentence, the trial court considered all the "factors in aggravation and mitigation as suggested by the Criminal Code." (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—5—3.1, 1005—5—3.2.) We hold that the trial court did not abuse its discretion in view of the nature of the offense.

We further find that defendant's reliance on *People v. MacRae* (1977), 47 Ill. App. 3d 302, is inapposite. In that case, the court did not remand for resentencing because of the prosecutor's remarks, but rather because, among other reasons, the trial court failed to consider defendant's remorse. (47 Ill. App. 3d 302, 315-16.) Furthermore, in this case, the prosecutor's remark was made prior to the time defendant had testified and was, therefore, not improper.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

SCHNAKE and REINHARD, JJ., concur.