THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JASMINE McKENZIE, Defendant-Appellant.

First District (5th Division)   No. 1—92—1967

Opinion filed May 20, 1994.

William Hedrick, of Skokie, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Scott V. Brunner, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Following a bench trial, defendant was convicted of first degree murder and sentenced to 29 years' imprisonment. On appeal, defendant contends that she was denied her sixth amendment right to effective assistance of counsel. She also argues that her sentence was excessive. For the reasons set forth below, we affirm.

## FACTS

Defendant Jasmine McKenzie was charged with first degree murder in connection with the death of her boyfriend, Derrick Walker. After she waived her right to a jury trial, a bench trial was held. At that trial, the following evidence was revealed.

On October 6, 1990, the victim, Derrick Walker, was visiting with Erica Brown and her younger sister Tamara at the garden apartment of Erica's grandmother. Walker lived in an apartment above the garden apartment with his mother. The layout of each apartment was identical.

Both Erica and Tamara Brown testified to the events of that night. At approximately 10 p.m., Walker, Erica and Tamara were in Erica's room watching television and listening to music. The doorbell rang and Tamara opened the door to find defendant standing there. Defendant asked for Walker. When Walker came to the door defendant asked him what he was doing downstairs. Walker and defendant then went upstairs to Walker's apartment. Both Erica and Tamara heard them enter the upstairs apartment and heard the upstairs door being locked.

Erica and Tamara both heard a loud discussion begin between defendant and Walker. During this conversation, Tamara heard defendant say, "If you love the baby, you wouldn't be talking to anybody else," to which Walker responded, "I wasn't talking to anyone, I was downstairs laughing and joking."

Erica heard Walker and defendant talking in the living room of the upstairs apartment. She heard defendant ask Walker, "What were you doing downstairs?" According to Erica, Walker responded that "he was visiting a girl and her family," at which time defendant told the victim to get a job so that he could take care of his son. The voices became louder and moved from the living room to the hallway of the upstairs apartment.

Both Erica and Tamara next heard Walker and defendant hitting

each other. Tamara heard Walker ask defendant, "What are you hitting me for?" Tamara heard them move into Walker's bedroom, continuing to argue. Erica then heard someone walking towards the bedroom of the upstairs apartment and someone else walking towards the front door of the apartment. She heard defendant's voice from near the front door ask for keys and ask Walker why he was trying to lock her in the apartment. Erica then heard Walker walk to the front door. Erica heard one person strike the other and someone fall to the floor. Erica stated that she heard crying and then heard someone walk from the front door of the upstairs apartment to the bedroom.

Erica testified that after approximately three to five minutes of silence, she again heard someone walk from the front door of the upstairs apartment to the bedroom. Tamara said she heard Walker ask defendant, "What do you have the knife for?" Both Tamara and Erica then heard a loud thud come from Walker's bedroom. After the thud, the electricity in the downstairs apartment went off and the apartment trembled.

Erica began to walk back and forth through her apartment calling for Walker. She returned to her bedroom and heard scratching on the floor of the upstairs apartment. Tamara also heard this scratching. Tamara then heard someone run from Walker's bedroom to the kitchen. The scratching moved from the bedroom to the hall of the upstairs apartment. Erica heard defendant yelling at Walker and then say something about "another female." Erica then heard something that sounded like someone kicking someone else coming from where the sound of scratching was emanating.

Erica and Tamara then ran up to Walker's apartment. They heard defendant screaming from inside the apartment for them to open the door and to call an ambulance. They broke down the door to Walker's apartment. Defendant was "hysterical," standing by the wall and yelling for Erica and Tamara to help Walker. Defendant kept telling them to call the police and an ambulance. Erica pushed defendant away and defendant ran down the stairs. Erica and Tamara found Walker lying face down in the living room with a massive wound in his neck.

Officer William Kanis testified that when he arrived on the scene he found defendant standing in front of the apartment. She told him that she stabbed someone and that he was bleeding. Kanis subsequently arrested defendant and took her to the police station. Defendant initially seemed upset, but calmed down once she reached the station. Kanis testified that he noticed a slight swelling under defendant's right eye and a cut on her tongue. He stated that he did

not see any of these injuries, however, until defendant pointed them out. At one point, defendant appeared to faint.

Kanis said that when they arrived at the station, defendant made a statement in which she admitted stabbing Walker. In that statement, defendant said that she and Walker had an argument and that he locked her in the apartment to prevent her from leaving. She said that Walker struck her in the face and that she then ran into the kitchen, grabbed a knife and stabbed Walker.

Detective Jim Pulia, an evidence technician, testified that he arrived on the scene and found Walker's body on the living room floor of the upstairs apartment. He noticed that the front door of the apartment had been forced open. The television and television stand located in Walker's bedroom had been knocked over and were lying on the floor. The bed in Walker's room was blood-soaked and the sheets and bedspread were also covered with blood.

Detective Pulia said that there was a large pool of blood in the hallway approximately seven to eight feet from the bedroom doorway. There was also blood "splattering" on the bedroom door about six feet above the floor which arched upwards towards the ceiling. Pulia also noted that there was blood on the bedroom ceiling. He saw a trail of blood droplets which led out into the hallway.

Outside of the bedroom, Pulia found a 9¹/₂-inch knife which had blood on its blade. He also found a second knife, approximately 13 inches long, about six feet away from the first knife. This knife was found next to a piece of newspaper. Both the second knife and the newspaper had blood on them. After Pulia's investigation, a third knife was discovered by a member of Walker's family. That knife, which was found near the east wall of the bedroom, was covered in blood. All the blood on all three knives and that on the bedding could have come from Walker; that blood could not have been defendant's blood. The blood on two of the knives could have come from splattering blood.

Dr. Michael Chambliss, an assistant medical examiner, testified that Walker, who was 5 feet 10 inches and weighed 155 pounds, died from an eight-inch deep incise wound in the left side of his neck. This wound was approximately two inches wide and severed the strap muscles on the left side of Walker's neck, his Adam's apple and an artery on the right side of the neck. According to Dr. Chambliss, this wound was produced by a great downward force, not a mere swipe.

Dr. Chambliss stated that in addition to the fatal wound, Walker received 13 or 14 stab wounds, including: two stab wounds to each temple, two stab wounds on the back of the scalp, a stab wound to the left forearm, and a stab wound to the back of the right shoulder.

Dr. Chambliss also found another wound on the scalp which was consistent with being struck with a blunt instrument or being kicked. He said that two of the knives found at the scene could have produced the fatal wound and that all of the knives at the scene could have produced the smaller wounds.

After the State rested, defendant called four witnesses in support of her defense of self-defense. Each of these witnesses attested to Walker's predilection for violence. Two of the witnesses, Michelle Morris and Leroy Clark, testified that in June 1990 they heard Walker and defendant arguing and saw Walker strike defendant. The police were called, but left when defendant told them that everything was under control. Greg Peters testified that Walker became violent towards him when he spoke to defendant. Carla Johnson testified that she previously dated Walker. She stated that they generally had a peaceful relationship, but once got into a fistfight. Defendant did not testify on her own behalf.

Defendant was found guilty of first degree murder. In rejecting defendant's claim of self-defense, the trial court specifically concluded that defendant, not the victim, was the aggressor. In so concluding, the trial court noted that defendant came to find Walker at the garden apartment and Walker initially hit defendant. The trial court also noted that defendant used three knives and that there was no indication that Walker, who had been stabbed 13 or 14 times, ever had or used any weapons on the night in question. The trial court concluded from the number of wounds and the amount of blood on defendant's body that she hovered over Walker after inflicting the fatal wound and stabbed him repeatedly.

During the sentencing hearing defendant exercised her right of allocution. She stated that on the night of the occurrence she went to see Walker and an argument ensued during which Walker accused her of certain things, attacked her and locked her in the apartment. She said that Walker was the aggressor on that night and that he had abused her in the past. She said that she wanted to testify, but that she "was told by the last attorney at the last minute not to do so."

The trial court subsequently sentenced defendant to 29 years' imprisonment. Defendant filed a motion for a new trial and also filed a supplemental motion in which she alleged ineffective assistance of counsel. Defendant now appeals her conviction and sentence.

OPINION

On appeal, defendant first contends that she was denied her sixth amendment right to effective assistance of counsel. More specifically,

defendant claims that her counsel was ineffective in presenting her defense of self-defense. Defendant points to the fact that her trial counsel did not call her to the stand to testify in spite of the fact that she wished to testify and in spite of the fact that her state of mind as a defendant claiming self-defense was a key element to her defense. Defendant asserts that she did not have a criminal record and contends that she would have testified to the substance of what she said while exercising her right of allocution at the sentencing hearing—that Walker abused her on prior occasions and that he was the aggressor on the night in question. Defendant also alleges that trial counsel was ineffective in failing to call witnesses who would attest to her injuries on the night of the accident or introduce photographs or medical records which indicated that she suffered a bruise to her right eye, pain to her left ribs, a laceration on her tongue, and experienced some dizziness. Defendant further argues that trial counsel should have called a psychiatrist who examined her on that night to testify to her depressed and tearful emotional state and to the fact that she had been abused in the past.

A claim for ineffective assistance of counsel will be sustained if "counsel's representation fell below an objective standard of reasonableness and *** counsel's shortcomings were so serious as to 'deprive the defendant of a fair trial,' *** [and] 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, quoting *Strickland v. Washington* (1984), 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068; *People v. Sutherland* (1992), 155 Ill. 2d 1, 610 N.E.2d 1.) There is a strong presumption that counsel was competent, and his performance will be examined as of the time of trial, not in hindsight. (*People v. Whittaker* (1990), 199 Ill. App. 3d 621, 557 N.E.2d 468.) Counsel's competence will not be appraised on matters involving the exercise of judgment, discretion or trial tactics. *People v. Lovitz* (1984), 127 Ill. App. 3d 390, 468 N.E.2d 1010.

We note at the outset that the evidence which defendant claims should have been introduced by her counsel was already substantially before the trial court, even though it was not as fully textured or developed as it could have been with the introduction of the omitted evidence. First, defendant's physical condition on the night in question was established by Officer Kanis' testimony. As noted, Kanis testified that defendant's eye was swollen, that she had a cut on her tongue and that she appeared to faint at one point. The omitted medical reports to which defendant refers basically highlight those same injuries with one additional symptom involving some pain in

defendant's abdomen. (See *People v. Jones* (1993), 155 Ill. 2d 357, 614 N.E.2d 1219; *People v. Peterson* (1993), 248 Ill. App. 3d 28, 618 N.E.2d 388; see also *People v. Crosby* (1993), 243 Ill. App. 3d 1083, 614 N.E.2d 199.) Moreover, the trial court specifically acknowledged that defendant suffered these very same injuries when rendering its decision.

Likewise, the trial court also had before it evidence which touched on defendant's emotional state following the killing. There was considerable testimony here, albeit from lay witnesses, describing defendant's emotional distress after the occurrence. (See *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) Both Erica and Tamara Brown testified that defendant was in a highly agitated state immediately after the killing. Officer Kanis also testified that defendant was panicky, particularly right after the incident. In this respect, the information elicited from the State's witnesses, some during direct examination and some during cross-examination, was substantially similar to the description of defendant's post-occurrence mental state which was set forth in the psychiatrist's report. *Peterson*, 248 Ill. App. 3d at 40-41; *People v. Smalley* (1991), 249 Ill. App. 3d 964, 621 N.E.2d 7; see also *People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270.

Finally, the trial court had before it evidence that Walker abused defendant on prior occasions and that he had been violent in the past. (See *Peterson*, 248 Ill. App. 3d at 41.) Although defendant did not testify herself, defense counsel presented testimony from two other witnesses who each saw Walker abuse defendant on at least one prior occasion. Trial counsel also called one of Walker's former girl friends, who testified that she too had been abused by Walker on a prior occasion. See *Carlson*, 79 Ill. 2d at 585.

The State has urged that the alleged omissions of defense counsel reflect tactical decisions consistent with counsel's trial strategy. (*Lovitz*, 127 Ill. App. 3d at 397 ("[i]t is well settled that a review of competence will not be appraised on the basis of matter involving the exercise of judgment discretion or trial tactics").) We would agree with that contention insofar as it pertains to the failure of trial counsel to call defendant as a witness. Although defendant stated that she wanted to testify in order to tell her side of the story as she did in her allocution at the sentencing hearing, that statement during allocution was not subject to cross-examination. On the other hand, her testimony at trial would have subjected defendant to the full brunt of adversarial cross-examination and could have very well produced liabilities which outweighed the benefits of putting her on the stand, regardless of her lack of a criminal record. (*People v. Witherspoon* (1973), 55 Ill. 2d 18, 302 N.E.2d 3; *People v. Smalley* (1984),

122 Ill. App. 3d 70, 460 N.E.2d 866; see also *People v. Sanders* (1991), 209 Ill. App. 3d 366, 568 N.E.2d 200.) This is particularly true in light of the strong physical and testimonial evidence of the occurrence itself, including, among other things, defendant's accusatory and demanding posture towards Walker immediately preceding the killing and the numerous stab wounds inflicted upon the unarmed Walker involving as many as three knives, all of which will be more fully discussed and analyzed later in this opinion.

■ Notwithstanding the State's assertions to the contrary, we do not agree that all of counsel's other omissions can be justified under the increasingly expansive rubric of trial strategy, particularly his failure to offer psychiatric and medical evidence concerning defendant's physical and emotional state on the night of the occurrence. However, in this case the actual occurrence evidence establishing that defendant was the aggressor is strong enough and detailed enough to overcome any counterinferences to be derived from any additional evidence pertaining to her physical and emotional condition following the occurrence. Consequently, we need not address whether these omissions caused the performance of defendant's trial counsel to fall below an objective standard of reasonableness because in any event defendant has failed to satisfy the second prong of the *Strickland* analysis under which there must be a reasonable probability that the result of the proceeding would have been different, but for counsel's unprofessional errors. See *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Enoch* (1991), 146 Ill. 2d 44, 585 N.E.2d 115.

The evidence showed that it was defendant who came to find Walker at the garden apartment. She questioned Walker accusingly about what he was doing at the garden apartment and told him that if he loved their son he should not be talking to another woman. The evidence also demonstrated that during the ensuing argument it was defendant who initially struck Walker with Walker asking "why are you hitting me?" Moreover, the evidence supports the inference that defendant went to the kitchen at least once, and probably more than once, to arm herself, with apparently three different knives. Defendant then stabbed Walker in the neck with sufficient downward force to cause an enormous amount of blood to splatter over the walls and ceiling of the bedroom. Finally, the evidence supports the inference that defendant must have stood over Walker to stab him repeatedly, and possibly strike him with a blunt object or else to kick him, as he was dying from the fatal neck wound. The trial court expressly pointed out that defendant used three knives and that there was no indication that Walker ever had any weapons on the night of the

occurrence. In light of this strong physical and testimonial evidence, we cannot say that the outcome of defendant's trial would have been different if trial counsel had presented the omitted evidence in question to further amplify those factors pertaining to her physical and emotional condition, as well as her past abusive relationship with the victim, with which the court already had a threshold familiarity. *People v. Melgoza* (1992), 231 Ill. App. 3d 510, 595 N.E.2d 1261; *People v. Williams* (1991), 215 Ill. App. 3d 800, 576 N.E.2d 68; see also *People v. Consago* (1988), 170 Ill. App. 3d 982, 524 N.E.2d 989; *People v. Castiglione* (1986), 150 Ill. App. 3d 459, 501 N.E.2d 923.

■ We next turn to defendant's contention that the 29-year sentence she received was excessive. Specifically, defendant argues that this sentence was excessive in light of her age, her background and the fact that the occurrence itself demonstrated a lack of premeditation.

A trial court's decision in matters of sentencing is entitled to great deference since it is in a superior position to assess and weigh the relevant factors and considerations. (*People v. Lambrechts* (1977), 69 Ill. 2d 544, 372 N.E.2d 641; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) In imposing sentence, the trial court may consider a myriad of factors including "defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age," as well as the nature and circumstances of the offense. (*Perruquet*, 68 Ill. 2d at 154; *People v. Requena* (1982), 105 Ill. App. 3d 831, 435 N.E.2d 125.) A reviewing court will not substitute its judgment for that of the trial court (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541), particularly where the sentence in question is well within the statutory limits. *Lambrechts*, 69 Ill. 2d at 559.

While we would not necessarily have imposed the same sentence considering defendant's relatively young age, her lack of a criminal background, and considering the passion and jealous anger that may have motivated this crime, we cannot say that this sentence constituted an abuse of discretion. The 29-year sentence was only nine years over the statutory minimum available for the crime. (See *People v. Garcia* (1991), 217 Ill. App. 3d 350, 577 N.E.2d 183.) Moreover, although defendant may have been acting in the throes of intense anger or jealousy, the wounds she did inflict on the victim were brutal. She stabbed Walker 13 or 14 times with three different knives, the fatal "butchering and splicing" wound being so forceful that it sliced through the victim's neck muscles and Adam's apple and severed an artery. (See *People v. Almo* (1985), 108 Ill. 2d 54, 483 N.E.2d 203; *People v. Lykins* (1979), 77 Ill. 2d 35, 394 N.E.2d 1182.) We are also cognizant of the fact that the trial court concluded that

some of these stab wounds were inflicted upon the victim's head and shoulders while he was lying there dying from the fatal wound. Although there were mitigating factors present in this case, we cannot say that the trial court's balancing of the relevant factors and imposition of a relatively low sentence constituted an abuse of discretion in light of the circumstances surrounding the crime. See *People v. Brown* (1991), 218 Ill. App. 3d 890, 578 N.E.2d 1168; *People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335; *People v. Rogers* (1986), 141 Ill. App. 3d 374, 490 N.E.2d 133 (rehabilitation does not outweigh other considerations which suggest a more severe sentence).

For the foregoing reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

MURRAY, P.J., and McNULTY, J., concur.