THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES WINCHEL, Defendant-Appellant.

First District (3rd Division) No. 83—1247

Opinion filed August 12, 1987.

894

Thomas F. Geraghty, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Peter D. Fischer, and Virginia M. Bigane, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant James Winchel and Richard O'Donnell were indicted for the October 8, 1981, murders of Brad Roth and Michael Kelley. They were tried simultaneously, Winchel by a jury and O'Donnell by the bench, in the circuit court of Cook County. Winchel was convicted and sentenced to natural life in prison while O'Donnell was acquitted.

On appeal, defendant contends: (1) the State failed to prove him guilty beyond a reasonable doubt because the evidence against him was insufficient and because the guilty verdict returned by the jury was inconsistent with O'Donnell's acquittal by the trial court; (2) the admission of hearsay testimony of a motive for the murders and a statement by O'Donnell denied him a fair trial and the right to confront the witnesses against him; (3) the admission of perjured testimony denied him due process of law; (4) the State's failure to disclose evidence favorable to him concerning the background of a key State's witness denied him a fair trial; (5) the admission into evidence of

statements allegedly made by him after he was taken into custody violated his *Miranda* rights; (6) he received ineffective assistance of counsel; (7) the trial court erred in sentencing him to a mandatory natural life sentence.

Shortly after 4 a.m. on October 8, 1981, Brad Roth and Michael Kelley were shot and killed in a gangway near 61st Place and Archer Avenue in Summit, Illinois. At trial, Richard Key and Michael Hubbard testified for the State. They testified that they ran into defendant Winchel and the victims around 7 p.m. on October 7 at Al's Hilltop Lounge. After leaving Al's Hilltop Lounge alone and going to several other bars, they went to 61st Place and Archer Avenue to buy some heroin. When Hubbard returned to Key's pickup truck after attempting the buy, they walked toward Doc and Joe Pelfrey's, a bar across the street and in front of which they saw defendant and the victims. According to Hubbard, when they reached the middle of Archer Avenue they saw defendant holding a gun on the victims and the gun "went off." At that point they decided to leave. As they were walking away, they saw defendant leading the victims into a gangway at gunpoint and O'Donnell following closely behind. After Hubbard and Key got into Key's pickup, they heard two gunshots in rapid succession and then drove away.

Jacqueline Foley also testified for the State. She had gone to Al's Hilltop Lounge with O'Donnell and Karen Slager at around 1:30 a.m. on October 8. Defendant and the victims were at the bar. O'Donnell told her that something was "going to go down" that night after she asked him to get Kelley away from her. Around 4 a.m., she, O'Donnell, defendant and the victims left the bar together and she asked O'Donnell for a ride home. They all rode in O'Donnell's car to 61st and Archer Avenue to buy some beer. O'Donnell and the victims left to buy the beer while she and defendant remained in the car. Shortly thereafter, defendant pulled out a gun, said, "Let's see if this works," and fired the gun in the car. Defendant then put the gun in his waistband, got out of the car and walked in the direction that O'Donnell and the victims had gone. After he left, Foley drove to the alley behind Doc and Joe Pelfrey's and immediately to the north of the gangway where the victims were shot. She moved the car without knowing where she was going because she was scared. After she parked the car in the alley, she heard two gunshots and immediately thereafter O'Donnell came around the corner of the alley and got in the car. She asked O'Donnell what happened and he said, "Jimmy put a gun to those guys' heads and shot them both." After they drove away O'Donnell took his shirt off, wiped his arms and hands with it and

threw it out of the window. They then drove past the scene twice after she asked O'Donnell to go back to see what happened to defendant. Afterwards, they drove to her home where O'Donnell said they had better get their stories straight and that she should say he responded he "did not know" when she asked him what had happened.

James Fitzgerald, a truck driver for the village of Summit, testified he was working in the area of 61st and Archer at approximately 4 a.m. on October 8. He saw five people in a beige Nova going north on Archer Avenue at that time and later saw the car parked on 61st Place. As he approached the intersection of 61st Place and Archer Avenue, he saw defendant standing on the corner with his hand inside his waistband. He also saw three other men on the sidewalk, one of them two buildings away from defendant and the other two further down the block. Fiztgerald testified that the man standing alone appeared to be shouting at the other two, who were facing him. He continued north on Archer Avenue, parked in a gas station on 60th Place to wait for the streetsweeper he was working with and then heard "two loud pops." He then looked south down Archer Avenue and saw two men struggling, one of whom, Fitzgerald determined upon approaching the scene, was defendant. Sometime later, he saw the beige Nova passing by or near the crime scene, took down the license plate number and gave it to the police. Other than defendant and the three other men, he did not see anyone else on the street or a truck parked near 61st Place and Archer Avenue at the time of the incident and heard nothing else between the time he passed the men on Archer and heard the two "pops."

George Telford, a part-time Summit police officer, testified that, at approximately 4:15 a.m. on October 8, he heard two gunshots while he was getting into his car, which was parked on 61st Place near Archer Avenue. He then walked in the direction of the gunshots and, as he turned the corner of 61st Place and Archer Avenue, he passed a white male walking rapidly in the opposite direction who turned the corner and walked east on 61st Place. He then walked north on Archer Avenue and observed blood coming out of a gangway adjacent to a community center on the northeast corner of Archer Avenue and 61st Place. As he approached the gangway, he saw the bodies of two men on the ground and defendant standing over one of them. Officer Telford then pointed his gun at the defendant and told him to get his hands up and come out of the gangway. As defendant did so, the officer saw a gun in his waistband. He then grabbed defendant, forced him against a wall, heard a blunt sound similar to that of metal hitting concrete and then saw a weapon on the ground. He then forced

defendant onto the ground and picked up the weapon before more officers arrived. Officer Telford had not heard a gunshot around 4 a.m. while sitting in the Rustic Pub near 63rd Place and Archer Avenue and did not see a pickup truck nor anyone in the street upon leaving the tavern.

OPINION

■ Defendant first contends he was not proven guilty beyond a reasonable doubt because the evidence against him was insufficient and because the inconsistent verdicts returned by the judge and jury created a reasonable doubt of his guilt. In asserting the insufficiency of the evidence, defendant argues that the only competent evidence against him is circumstantial because no one saw him commit the murders. He dismisses the testimony of Hubbard and Key as perjured. He maintains that, because of the circumstantial nature of the evidence, his conviction should be reversed if there is a reasonable hypothesis of his innocence.

While no one saw defendant commit the murders, the eyewitness testimony of his mere presence at the crime scene under suspicious circumstances constitutes direct evidence of guilt. (*People v. Zenner* (1979), 78 Ill. App. 3d 40, 54, 396 N.E.2d 1107.) Moreover, defendant's own testimony as to his presence at the crime scene and the circumstances surrounding the crime and Officer Telford's testimony as to his observation and apprehension of defendant at the scene of the crime also constitute direct evidence of guilt. (*People v. Allen* (1984), 124 Ill. App. 3d 710, 711-12, 464 N.E.2d 832.) Thus, even if the testimony of Hubbard and Key may have been perjured, the evidence against defendant was not entirely circumstantial and reversal of his conviction is not required simply because there is a reasonable hypothesis of innocence, *i.e.,* O'Connell's guilt of the murders. Defendant's argument is based on the second paragraph of Illinois Pattern Jury Instructions, Criminal, No. 3.02 (2d ed. 1981) (IPI Criminal 2d), entitled "Definition of Circumstantial Evidence," which states, "You should not find defendant guilty unless the facts or circumstances proved exclude every reasonable theory of innocence." This paragraph of IPI Criminal 2d No. 3.02 must be given, *i.e.,* this qualification to a conviction applies only where the evidence is entirely circumstantial (*People v. Minish* (1974), 19 Ill. App. 3d 603, 312 N.E.2d 49), which is not the case here.

■ Moreover, that Hubbard's and Key's testimony may have been perjured, as allegedly shown at the post-trial hearing, does not require a reversal of defendant's conviction. In *People v. Banks*

(1984), 121 Ill. App. 3d 279, 459 N.E.2d 992, the defendant contended that the evidence was insufficient to prove him guilty beyond a reasonable doubt. The court disagreed with the defendant, although it also held that, because his conviction was possibly based on perjured testimony, he was entitled to a new trial. The court stated, *inter alia*:

> "The jury may accept all, part or none of the evidence presented at trial, and its determination should not be disturbed upon review unless it is so contrary to the evidence as to raise a reasonable doubt of defendant's guilt. [Citation.]
>
> In finding defendant guilty of murder, based on the conflicting evidence * * *, the jury * * * obviously rejected defendant's account * * *. It is apparent that the jury did not accept defendant's testimony * * *.
>
> Our review of the record persuades our conclusion that, if believed by the jury, the evidence * * * was sufficient to support its verdict." (121 Ill. App. 3d 279, 286-87, 459 N.E.2d 992.)

Similarly here, the testimony of Hubbard and Key, although possibly perjured, along with the other evidence adduced at trial was more than sufficient to support defendant's conviction. Since defendant made no showing of perjury at trial, he cannot now contend that the jury should not have believed Hubbard's and Key's testimony.

■ That the evidence against defendant and O'Donnell may have been the "same in all important respects," does not mandate a reversal because of the inconsistent verdicts. Rather, the evidence against each defendant must be *"identical in all respects"* for such verdicts to raise a reasonable doubt of guilt. (Emphasis added.) (*People v. Vriner* (1978), 74 Ill. 2d 329, 343, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858.) Where there is the slightest difference in the evidence against codefendants, the acquittal of one does not raise a reasonable doubt of the other's guilt. (*People v. Stock* (1974), 56 Ill. 2d 461, 465, 309 N.E.2d 19, *overruled on other grounds, People v. Housby* (1981), 84 Ill. 2d 415, 420 N.E.2d 151, *cert. denied* (1981), 454 U.S. 845, 70 L. Ed. 2d 131, 102 S. Ct. 160.) Here, there was more than a slight difference in the evidence offered against defendant and O'Donnell. It suffices to recount a few of the most pivotal differences.

■ Hubbard and Key saw defendant, not O'Donnell, with the victims and holding a gun in front of Doc and Joe Pelfrey's. They saw defendant, not O'Donnell, escorting the victims into the gangway at gunpoint. They saw a fourth person, identified by Key as O'Donnell, run into the gangway behind defendant and the victims. Key testified this person did not have anything in his hands. Foley testified that

defendant, not O'Donnell, produced a gun in O'Donnell's car and shot off a round. Fitzgerald saw defendant, not O'Donnell, holding his hand in his waistband where, Foley testified, he put the gun upon exiting the car. Finally, Officer Telford apprehended defendant, not O'Donnell, at the scene very shortly after two shots were fired and observed a gun in his waistband before it fell to the ground. Thus, defendant and O'Donnell were not tried on identical facts and O'Donnell's acquittal raises no reasonable doubt of defendant's guilt. Moreover, these differences in the evidence clearly show the fallacy of defendant's contention that the evidence against him was no stronger, and in fact weaker, than the evidence against O'Donnell.

Defendant next complains of the introduction of hearsay testimony of a motive for the shootings and a statement by O'Donnell which implicated defendant. He complains of several instances of hearsay motive testimony, some elicited by defense counsel and some by the prosecutor. He contends the testimony elicited by defense counsel was unresponsive to the question which it purported to answer and that he therefore should have moved to strike it but failed to do so. He also contends defense counsel failed to object to one of two instances of such testimony elicited by the State. He argues this hearsay testimony and the State's reference to it in closing argument denied him a fair trial and the right to confront the witnesses against him. The State contends this hearsay testimony was elicited as a result of trial strategy, which is not subject to review.

The hearsay motive evidence consisted of Key's testimony that "word went around that [the shooting] was over a pool game" and Hubbard's testimony that Kelley "had ripped some [drugs] off of" defendant. Defendant contends the prosecutor's questions to defendant's brothers, Thomas and William Winchel, as to whether they had heard that the victims had "ripped off" defendant also constitute hearsay motive evidence. We disagree. Both witnesses answered "No." It cannot then be said that the questions themselves were hearsay evidence or that defendant was prejudiced by the questions alone. Defendant also complains of the State's reference to the drug rip-off in its closing argument as proof of animosity between the codefendants and the victims which led to the shootings. Foley testified on cross-examination, after being called as a defense witness, that when O'Donnell entered the car in the alley behind Doc and Joe Pelfrey's he said defendant "had just shot" the victims and "put the gun to their heads and pulled the trigger."

■■ ■ Hearsay is testimony of an out-of-court statement offered to prove the truth of the matter asserted which rests, for its value, on

the credibility of the out-of-court asserter. (*People v. Rogers* (1980), 81 Ill. 2d 571, 411 N.E.2d 223.) The basis of excluding evidence under the hearsay rule is the absence of an opportunity to determine the veracity of the testimony. (81 Ill. 2d 571, 577, 411 N.E.2d 223.) However, the admission of hearsay evidence is harmless error where "[c]onsidering the evidence in its entirety, there is no reasonable possibility that the jury would have acquitted the defendant had the evidence complained of been excluded." (*People v. Ward* (1978), 63 Ill. App. 3d 864, 872, 380 N.E.2d 883; *People v. White* (1985), 134 Ill. App. 3d 262, 283, 479 N.E.2d 1121, *cert. denied* (1986), 475 U.S. 1126, 90 L. Ed. 2d 194, 106 S. Ct. 1650.

■ The hearsay testimony and the State's reliance on it in its closing argument did not deprive defendant of a fair trial. There was sufficient record evidence excluding this testimony to convict defendant. There is no reasonable possibility that, excluding this evidence, defendant would have been acquitted. As such, that his trial counsel contributed to the elicitation of the hearsay testimony through his trial tactics or strategy does not compel a contrary conclusion.

■ Defendant next contends the introduction of the perjured testimony of Hubbard and Key precluded the State from proving him guilty beyond a reasonable doubt "through means consistent with the dictates of due process." At the hearing on defendant's motion for a new trial, Laura Shelley and Donald Ropele testified that Hubbard and Key were with them at the Brookfield Motel on the night of October 7 until the early morning hours of October 8. Attached to the motion for new trial were the affidavits of Shelley and Ropele in which they stated that Hubbard and Key told them in the summer of 1982 that they were going to testify against defendant and O'Donnell, although they were not present at the murder scene, in order to obtain leniency from the State on criminal charges pending against them. Defendant asserts that this evidence clearly established that Hubbard's and Key's testimony was perjured. He maintains this perjured testimony materially contributed to his conviction, thus necessitating a new trial, and shifted the burden to the State to show beyond a reasonable doubt that it did not contribute to his conviction. The State responds that the newly discovered evidence offered by defendant to show the alleged perjury did not meet the standard for granting a new trial on the basis of such evidence, *i.e.*, it was not conclusive, likely to change the result upon retrial, material, noncumulative and discovered only after trial. Rather, it contends, the evidence merely impeached, discredited or contradicted that offered by Hubbard and Key and, thus, did not warrant a new trial.

■ That Hubbard and Key's testimony may have been perjured does not, alone, mandate a reversal of defendant's conviction. Defendant ignores the well-established rule that perjured testimony requires reversal where, and only where, the State knowingly used that testimony. (*Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173; *People v. Oswalt* (1975), 26 Ill. App. 3d 224, 227, 324 N.E.2d 666; *United States ex rel. Kowal v. Attorney General* (N.D. Ill. 1982), 550 F. Supp. 447; *People v. Berland* (1983), 115 Ill. App. 3d 272, 274, 450 N.E.2d 979; *People v. Smith* (1985), 139 Ill. App. 3d 21, 30, 486 N.E.2d 1347.) Moreover, the burden of establishing a knowing use of such testimony lies with the defendant. (139 Ill. App. 3d 21, 30, 486 N.E.2d 1347.) Here, not only has defendant not met that burden, he has also failed even to allege that the State's use of the allegedly perjured testimony of Hubbard and Key was intentional. Consequently, defendant's argument fails *ab initio*.

The split of authority among the various districts of the appellate court of Illinois and the divisions of the Appellate Court for the First District with respect to whether the State's use of perjured testimony must be "knowing" to warrant post-conviction relief (see *People v. Cihlar* (1984), 125 Ill. App. 3d 204, 465 N.E.2d 625 (and cases cited therein)) does not compel a contrary conclusion. While affirming the appellate court's decision in *Cihlar*, our supreme court also held that "[i]f there has been perjurious testimony at trial its falsity need not have been known personally by the prosecutor in order for there to have been a knowing use and a constitutional violation." (*People v. Cihlar* (1986), 111 Ill. 2d 212, 219, 489 N.E.2d 859.) It thus accepted the State's contention that a post-conviction petitioner must show a knowing use of perjury, but decided that because other members of the State's Attorney's office had been apprised of the possibility of perjury at defendant's trial, the petition should not be denied on what it considered "would be, under the circumstances, a formalism." (111 Ill. 2d 212, 218-19, 489 N.E.2d 859.) Moreover, there is a difference in the standards applied by the Appellate Court for the First District in judging claims of perjury raised in a post-conviction petition brought under either new section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1401) or the Post-Conviction Hearing Act (Ill. Rev. Stat. 1981, ch. 38, par. 122—1 *et seq.*) and raised on direct appeal. (Compare *People v. Cihlar* (1984), 125 Ill. App. 3d 204, 465 N.E.2d 625 (not necessary for defendant to allege knowing use of perjured testimony to avail himself of post-conviction relief), with *People v. Smith* (1985), 139 Ill. App. 3d 21, 486 N.E.2d 1347 (burden of proving that State knowingly used perjured testimony lies with

defendant).) As our supreme court has not conclusively resolved the split of authority over the differing standards applied to post-conviction petitions and to direct appeals with respect to the issue of perjury, we will adhere to the principle reiterated in *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173, that "a State may not knowingly use false evidence, including false testimony" to obtain a conviction. (360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177.) *Napue* began as a post-conviction proceeding. We can discern no worthwhile reason why the standard applied to this issue in a direct appeal should differ in any way from the standard applied to it in a post-conviction proceeding. Defendant, having failed to show or allege that the State knowingly used false testimony at his trial, is not entitled to a new trial.

 Next, defendant contends that the State's failure to disclose favorable evidence concerning Hubbard's cooperation with the State in prior cases also denied him a fair trial because this information would have assisted his efforts to impeach Hubbard's credibility. He argues that the State has a duty to disclose evidence in its possession and favorable to a defendant and that a failure to do so, whether by negligence or design, is a denial of due process. The State responds that evidence of Hubbard's prior cooperation with law enforcement authorities was presented to the jury, resulting in compliance with the duty asserted by defendant.

At the time of trial, there were seven burglary charges pending against Hubbard. He claimed he had not been promised anything by the State in return for his testimony in the instant case but that he was hoping for some consideration. Hubbard also testified he gave the State information about a homicide in Lyons, Illinois, when he surrendered himself, Key and Ropele for the burglaries. Subsequently, Hubbard pleaded guilty to burglary and received a five-year sentence. At the hearing on defendant's motion for new trial, Hubbard produced a *pro se* petition for executive clemency which he filed with the parole board while serving his sentence. The petition alleged that Hubbard had informed on at least 12 individuals who had been convicted as a result, including defendant, Key and Ropele between 1976 and 1982. The petition also alleged that an assistant State's Attorney told Hubbard that he would help him with the burglary charges against him if he testified in this case.

The State argues that Hubbard's allegations of assisting the State to convict at least 12 individuals are not supported by the record. It also contends that, even if true, the introduction of this evidence at trial would not have aided defendant's defense or diminished Hub-

bard's credibility any more than the evidence which was adduced at trial concerning Hubbard's having turned himself, Key and Ropele in and his having given the police information about the Lyons homicide.

*Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97, established that the failure of the State to disclose evidence favorable to a defendant despite his request for such evidence "violates due process where the evidence is material either to guilt or to punishment" regardless of the State's good or bad faith. *Brady* has been construed to impose a due process requirement that the State disclose impeachment evidence which tends to discredit the credibility of a State's witness. (*In re Hatfield* (1979), 72 Ill. App. 3d 249, 260, 390 N.E.2d 453.) *Brady* does not define the point in the proceedings at which disclosure is to be made; in Illinois pretrial disclosure is the rule. (72 Ill. App. 3d 249, 259, 390 N.E.2d 453; 107 Ill. 2d R. 412(c).) However, to establish a *Brady* violation a defendant must show that: (1) the evidence actually existed; (2) it was in the State's possession; (3) it was favorable to him; and (4) the State failed to disclose the evidence despite a specific request for it. *People v. Bivins* (1981), 97 Ill. App. 3d 386, 422 N.E.2d 1044.

■■ Defendant has failed to show that the "evidence" of Hubbard's prior cooperation with law enforcement authorities, the nondisclosure of which allegedly denied him due process, actually existed and was in the State's possession prior to trial, when defendant requested all of such evidence favorable to him, or thereafter. The "evidence," Hubbard's *pro se* petition for executive clemency, while not admitted at the post-trial hearing, is included in the record as an offer of proof. The trial court ruled, and we agree, that it was inadmissible as substantive proof of the allegations made in it. Moreover, defendant failed to elicit any testimony from Hubbard or his attorney as to the truth of Hubbard's claims of prior cooperation with the State and the prosecutor's agreement to help him in return for his testimony in the instant case. Defendant failed to make any independent showing whatsoever of the veracity of the petition's allegations. Thus, he has failed to show that the "evidence" actually existed and that, if it did exist, it was in the State's possession prior to trial or thereafter.

■■ Defendant next contends the admission into evidence of two statements he allegedly made after he was taken into custody violated his constitutional rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. He argues the statements were elicited from him before he was informed of his *Miranda* rights and before he could make an effective waiver of these rights. He asserts that the record fails to show whether the arresting officers had com-

pleted informing him of his constitutional rights before he was subjected to interrogation and that this failure makes it clear that a *Miranda* violation occurred. Moreover, he asserts he reasonably believed that the questioning which resulted in his incriminating statements was directed at him and, thus, that it constituted custodial interrogation. The State responds that the statements were made voluntarily, were not the result of custodial interrogation and were, therefore, properly admissible at trial without the necessity of showing that defendant had been advised of his *Miranda* rights and intelligently waived them.

The first statement defendant complains of was allegedly made by him in response to a question from Officer Dubinka, the third police officer on the scene of the crime. The record reveals that when Officer Dubinka arrived on the scene, he observed Officer Telford and Officer Frezados, the second officer to have arrived, handcuffing defendant. Officer Dubinka began walking up to Officer Telford and defendant while Officer Frezados was walking toward the gangway. At that point, Officer Dubinka asked, "What happened?" According to Officer Dubinka, this was a "general inquiry as to what was going on." When Officer Dubinka asked this question, defendant stated, "We went into the gangway and it went down."

Initially, we reject defendant's contention that the record fails to show that he was advised of his *Miranda* rights before he was subjected to a custodial interrogation. The record reveals that after Officer Telford had placed defendant on the ground with his gun at defendant's back, Officer Frezados came upon the scene. Officer Frezados exited his vehicle and walked up to Telford and defendant. Officer Telford handed Officer Frezados the gun found at the scene. Officer Frezados took the gun, locked it in his squad car and returned to Officer Telford and defendant. He then handed his handcuffs to Officer Telford and "was advising Winchel of his rights, *Miranda* warnings" while Officer Telford handcuffed defendant. After this testimony by Officer Frezados, he was asked by the prosecutor and answered:

"Q. Now officer, did you have occasion to view the bodies in the gangway?
A. Yes, I did.
Q. And when was that, right after the Miranda Rights?
A. That is correct."

This testimony was not rebutted by defendant. Consequently, it was sufficient to prove that Officer Frezados had completed advising defendant of his *Miranda* rights (see *People v. Roy* (1971), 49 Ill. 2d

113, 115, 273 N.E.2d 363) before he turned from Officer Telford and defendant to view the victims and, therefore, before Officer Dubinka asked what had happened.

However, we agree with defendant that, although he was advised of his *Miranda* rights, the record fails to show that he knowingly and intelligently waived them before making the complained-of statement. Defendant is correct that a heavy burden rests on the State to show a knowing and intelligent waiver of the right against self-incrimination before a defendant's statement may be admitted at trial. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628; *People v. Holloway* (1985), 131 Ill. App. 3d 290, 307, 475 N.E.2d 915.) Such a waiver may be express or implied but it cannot be presumed from a silent record or from the fact that a confession or a statement amounting to an admission of all or part of an offense was made by the defendant. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475-76, 16 L. Ed. 2d 694, 724-25, 86 S. Ct. 1602, 1628-29; *People v. Brown* (1986), 146 Ill. App. 3d 101, 496 N.E.2d 1020.) The record here is silent as to whether defendant knowingly and intelligently waived his *Miranda* rights before he made the complained-of statement. We cannot presume from the silent record before us or from the fact that defendant actually made a statement that he knowingly and intelligently waived his right against self-incrimination.

 █ The State's failure to demonstrate the requisite waiver of defendant's *Miranda* rights notwithstanding, his statement was nevertheless properly admitted at trial. A defendant's rights under *Miranda* are not violated by the admission of volunteered statements, *i.e.*, "[a]ny statement given freely and voluntarily without any compelling influence." (*Miranda v. Arizona* (1966), 384 U.S. 436, 478, 16 L. Ed. 2d 694, 726, 86 S. Ct. 1602, 1630.) Moreover, volunteered statements may be given even after a defendant has been placed under arrest. (See *People v. Lang* (1982), 106 Ill. App. 3d 808, 436 N.E.2d 260.) Whether a statement is voluntarily given depends upon the totality of the circumstances; the test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he made the statement. (*People v. Britz* (1984), 128 Ill. App. 3d 29, 40, 470 N.E.2d 1059.) The primary factors to be examined concern the nature of the interrogation leading to the statement and include the length of defendant's detention preceding the statement, the deprivation of necessities of life, deprivation of counsel, deception restricting the exercise of defendant's constitutional rights, and the defendant's age, education, emotional characteristics and experience in criminal matters.

128 Ill. App. 3d 29, 40, 470 N.E.2d 1059.

 Applying these principles to the instant case, we find that defendant's statement was volunteered and, therefore, properly admitted at trial. That it came only after a question by a police officer does not vitiate the voluntariness of the statement. In *Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682, the Supreme Court stated:

> "[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. 'Interrogation,' as conceptualized in \*\*\* *Miranda* \*\*\*, must reflect a measure of compulsion *above and beyond* that inherent in custody itself.
>
> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is \*\*\* any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Emphasis added.) (446 U.S. 291, 300-01, 64 L. Ed. 2d 297, 307-08, 100 S. Ct. 1682, 1689-90.)

Under *Innis,* we hold that the question, "What happened?" asked by a police officer just arriving, unbeknownst to him, on the scene of a double murder, was a question normally attendant to his investigatory duties and the arrest and custody of a suspect found on the scene of the crime, and that it did not reflect a measure of compulsion above and beyond that inherent in the defendant's custody itself. As such, it did not constitute express questioning or its functional equivalent, *i.e.,* custodial interrogation of defendant, in violation of his *Miranda* rights. Rather, the statement was freely and voluntarily made by defendant and thus properly admitted at trial. None of the factors relevant to this determination weigh in favor of a contrary conclusion.

Nor does *People v. Roy* (1971), 49 Ill. 2d 113, 273 N.E.2d 363, cited by defendant, compel such a conclusion. In *Roy,* the defendant, intoxicated at the time of his arrest, claimed that a statement he made after his arrest was improperly admitted into evidence because he had not properly waived his *Miranda* rights prior to the statement. After concluding that the defendant had not properly waived those rights, the court rejected the State's contention that defendant's statement was voluntary, stating, "It is unrealistic to say that a statement made by a handcuffed defendant to a police officer in a squad car in response to a question as to *whether he had shot the de-*

*ceased is 'volunteered.' "* (Emphasis added.) (49 Ill. 2d 113, 116, 273 N.E.2d 363.) *Roy* is distinguishable from the instant case in that the question therein was asked specifically of the defendant and, more importantly, was not a question normally attendant to: (1) the ordinary investigatory duties of a police officer; or, (2) in the absence of his attorney, the arrest and custody of a murder suspect.

■■ The second statement admitted at trial of which defendant complains was made to Summit Police Captain Anthony Cobro while he was transporting defendant to the police station in a squad car shortly after he had been taken into custody. During this ride, Captain Cobro testified, the defendant asked him "if [he] thought they were going to die." Captain Cobro responded, "[I]t's pretty serious" and defendant replied, "[T]hey got what they had coming." Defendant argues this second statement was largely contemporaneous in time and place with the first and thus presumptively tainted by its illegality. He argues that the record does not reflect that the illegality was removed by a subsequent administration of *Miranda* rights after the first statement or that he properly waived them. The State responds that this statement was freely and voluntarily made and that Captain Cobro's response, "[I]t's pretty serious," to his initial inquiry was not "designed" to elicit a further reply from him.

We disagree with defendant and hold that this statement was also properly admitted at his trial. Initially, we note that defendant's argument, dependent as it is on the alleged illegality of his first statement, is without merit. Since the record reflects that defendant was advised of his *Miranda* rights before he made the first statement, there was no illegality to taint the second statement or which required a second administration of his constitutional rights before the second statement was properly admissible. Additionally, we find that the second statement was not elicited by a custodial interrogation, but, rather, was also volunteered. *People v. Dalton* (1982), 91 Ill. 2d 22, 434 N.E.2d 1127, is dispositive of this issue. In *Dalton*, the defendant claimed that a statement made to a police officer during a post-arrest interview was inadmissible at trial because he had invoked his *Miranda* right to consult with an attorney prior to discussing the charges against him. During the interview, defendant asked the specific nature of the charges against him without any prompting by the police officer. After the officer told him, defendant made the complained-of statement. The trial court had based its denial of the motion to suppress on the finding that this statement was "voluntarily made because *** *defendant had initiated the inquiry about the charges.*" (Emphasis added.) (91 Ill. 2d 22, 31, 434 N.E.2d 1127.) The

defendant contested the denial of his motion only on the ground that the State had not shown a waiver of his *Miranda* rights. The court rejected defendant's argument, holding that the determination of the voluntariness of a statement is for the trial court and its ruling will not be disturbed unless contrary to the manifest weight of the evidence; it concluded that the finding that defendant had initiated the conversation was not disputed and the finding of voluntariness was clearly not against the manifest weight of the evidence. 91 Ill. 2d 22, 31, 434 N.E.2d 1127.

From *Dalton* we conclude that where a suspect, already advised of his *Miranda* rights, initiates a conversation with a police officer and the officer responds to the specific inquiry made of him, any ensuing remarks by the suspect are not the result of a custodial interrogation but are volunteered. As such, the State is not required to show an administration of *Miranda* warnings immediately preceding the statement or an effective waiver of those rights before such a statement is admissible as a volunteered statement. The statement of which defendant complains was properly admitted at his trial.

■■ Next, defendant contends that various errors committed by his trial counsel individually and cumulatively denied him the effective assistance of counsel guaranteed by the sixth amendment. (U.S. Const., amend. VI.) Specifically, he contends his trial counsel: (1) prejudiced him by establishing a motive for the crime; (2) failed to move to suppress his statements; (3) introduced damaging hearsay statements of witnesses and codefendant O'Donnell; (4) failed to raise the defense of intoxication; (5) failed to prepare him to testify at trial; (6) failed to discover favorable evidence; (7) failed to tender a crucial jury instruction on circumstantial evidence.

■■■ ■ To prove a claim of ineffective assistance, a defendant must show that his counsel "made errors so serious that [he] was not functioning as the 'counsel' guaranteed *** by the Sixth Amendment" and that he was prejudiced as a result, *i.e.,* "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) The appropriate test for prejudice is a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) However, a court may dispose of a defendant's claim by first determining that he did not suffer sufficient prejudice from the alleged ineffective assistance. (466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069-70.) The issue of effectiveness is to be de-

termined from the totality of counsel's conduct, not isolated instances, and a reviewing court will not extend its inquiry into areas involving counsel's judgment, discretion, trial tactics or strategy. *People v. McKendrick* (1985), 138 Ill. App. 3d 1018, 1026, 486 N.E.2d 1297.

■■■ The admission of the hearsay testimony of a motive and O'Donnell's statement implicating defendant did not deny him a fair trial. As such, we need not decide whether the first and third alleged instances of ineffective assistance have merit. Moreover, because defendant's statements to the police were volunteered, the second alleged instance of ineffective assistance is without merit. Even if filed, a motion to suppress would have been unsuccessful. As such, trial counsel's failure to make such a motion does not constitute ineffective assistance. *Cf. People v. Murphy* (1978), 72 Ill. 2d 421, 436, 381 N.E.2d 677 (defense counsel's failure to request a fitness hearing not indicative of incompetence where no *bona fide* doubt of fitness existed).

As the fourth instance of ineffective assistance, defendant raises his trial counsel's alleged "out of hand rejection" of intoxication or diminished capacity defenses without discussion or independent investigation, although such defenses were supported by the facts of the case. He asserts that, although the evidence adduced at trial and at the post-trial hearing clearly established he was heavily intoxicated at the time of the offense, his trial counsel advised him not to testify to that fact. In support, he points to the testimony at the post-trial hearing. Defendant's trial counsel testified that, although defendant told him he was "heavily intoxicated," he told defendant "he should minimize the effects of alcohol and drugs upon his condition *** but not lie about it." Defendant also cites a medical report prepared for the post-trial hearing which details his extensive history of substance abuse and states that on the night of the crime he consumed approximately 40 beers, one-half of a fifth of whiskey and several Tuinals.

■■■ Defendant has waived this ground of alleged ineffective assistance of counsel by failing to raise it in his motion for new trial. The only "failure to investigate" by trial counsel raised therein in alleging ineffective assistance is the failure "to investigate and obtain statements from the state's [*sic*] witnesses." Defendant also raises as ineffective assistance his trial counsel's directing him "to alter and change material elements of his testimony, to wit: *** that at the time of the offense he was neither affected by narcotics or alcohol, when in fact [he] had told trial counsel that he was virtually incapacitated as a result of alcohol and narcotic abuse at the time of the offense." These allegations are insufficient to constitute an allegation

that defendant's trial counsel failed to investigate and raise an intoxication or diminished capacity defense. The failure to raise an issue in the motion for new trial constitutes a waiver of the issue on appeal. (*People v. Caballero* (1984), 102 Ill. 2d 23, 31, 464 N.E.2d 223, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362.) Even if we were to conclude that ineffective assistance of counsel constitutes plain error, an exception to the general rule of waiver (*People v. Smalley* (1984), 122 Ill. App. 3d 70, 76-77, 460 N.E.2d 866), we are constrained to conclude that defendant has not shown he was denied the effective assistance of counsel by his trial counsel's failure to investigate an intoxication or diminished capacity defense.

Simply put, the record here does not warrant the conclusion that defendant's trial counsel failed to investigate such defenses. The new counsel who represented defendant at the hearing on the motion for new trial did not ask defendant's trial counsel on direct examination whether he had investigated defenses other than the one raised at trial, *i.e.*, that O'Donnell shot the victims. The only evidence adduced at the post-trial hearing on the issue of defendant's intoxication on the night of the crime was brought out on the State's cross-examination of defendant's trial counsel. He testified that, while defendant did tell him he was heavily intoxicated at the time of the crime, defendant did not tell him that he did not know what was going on around him or that he was incoherent. This testimony is inadequate to show that defendant's trial counsel never investigated an intoxication or diminished capacity defense. That on redirect examination defendant's new counsel inquired of his trial counsel's knowledge of defendant's extensive history of substance abuse and showed that he was not aware of certain specifics thereof does not compel a contrary conclusion. Again, defendant's new counsel failed to ask whether his trial counsel ever considered the defenses of intoxication or diminished capacity.

*United States ex rel. Rivera v. Franzen* (N.D. Ill. 1984), 594 F. Supp. 198, cited by defendant, is distinguishable. Therein, the court applied the " 'reasonably competent attorney' " standard adopted by the Supreme Court in *Strickland*. The court specifically found that the petitioner's trial counsel "did not make any investigation of a potential insanity defense, aside from his conversations with [petitioner]." (594 F. Supp. 198, 202.) The court concluded that those conversations did not amount to a reasonable investigation into a potential insanity defense and that trial counsel's failure to consider any defense other than that suggested by the petitioner was also unreasonable. (594 F. Supp. 198, 202-03.) The court ultimately agreed that defendant had been denied effective assistance of counsel. (594 F.

Supp. 198, 204.) Here, in contrast, we cannot conclude that defendant's trial counsel did not make any investigation of potential intoxication or diminished capacity defenses due to defendant's failure to adduce evidence of that fact at the post-trial hearing. While the failure to investigate a defense may indicate actual incompetence, conjecture may not serve as the basis of a claim of ineffective assistance of counsel. *People v. Krankel* (1985), 131 Ill. App. 3d 887, 892, 476 N.E.2d 777.

The fifth alleged instance of ineffective assistance is the failure of defendant's trial counsel to adequately prepare him to testify at trial in that he gave him no general advice with respect to his testimony and discussed it with him for only a half hour on the day he testified. Defendant also contends his trial counsel told him to lie that the gun found at the crime scene was in his waistband when Officer Telford arrived, not on the ground as defendant claimed. He points to his trial counsel's admission that he "never specifically discussed with [defendant] the facts as to how the homicide occurred." Defendant claims this omission violated defense counsel's duty to "seek *** all relevant facts known to the accused" and "all legally relevant information." (ABA Standards, Defense Function sec. 4—3.2(a) (2d ed. 1980).) He asserts that the ambiguous instruction from his trial counsel to "testify consistently with the way witnesses testified, so long as he could do so without lying" encouraged him to lie and reveals the lack of advance preparation of defendant's testimony. Defendant concludes that his trial counsel's inadequate preparation of him to testify resulted in a failure to present a convincing defense of intoxication.

In response, the State points to the testimony of defendant's trial counsel that he did not tell him to lie about whether the gun was in his waistband but told him to testify it was on the ground, as defendant claimed. The State justifies trial counsel's failure to ask defendant whether he committed the crime on the grounds that an attorney's personal opinion of his client's guilt or innocence is immaterial to a claim of incompetence where he presented a vigorous and thorough defense. The State concludes that the manner and extent of investigation and preparation for trial are matters within the discretion of counsel.

At the post-trial hearing, defendant did not state that his trial counsel conferred with him for only one half hour before he testified at his trial, although he did state on cross-examination that his trial counsel told him 25 minutes before he testified to "go along with the police officer's statement." Defendant's trial counsel testified he told defendant to "minimize the effects of alcohol and drugs upon his con-

dition *** but not to lie about it." He also testified he: did not tell defendant to lie about any facts in this case; "never specifically discussed with [defendant] *** how the homicide occurred"; "never specifically asked him whether he did it." He also stated, "We did discuss many of the facts surrounding his arrest and *** the events of that night" and that the "only discussions" he had with defendant "with regard to specific facts" involved telling defendant to "testify consistently with the way witnesses testified *** without lying." On redirect examination by defendant's new counsel, his trial counsel testified that "we had a number of contacts, obviously, during the course of the pre-trial events of this case."

The testimony at the post-trial hearing was insufficient to prove that defendant's trial counsel failed to adequately prepare him to testify at trial. That he may have told defendant 25 minutes before he took the stand to conform his testimony to that of the police officers does not amount to proof that defendant's trial counsel conferred with defendant for "only" a half hour on the day he testified. Moreover, the testimony of defendant's trial counsel reveals that, while he may not have asked defendant specifically how the homicide occurred or whether he committed it, he did discuss with defendant many of the facts surrounding defendant's arrest and the events of that night. While defendant's trial counsel admitted telling defendant to conform his testimony to that of the other occurrence witnesses, he specifically denied having told defendant to lie. In view of the insufficient evidence on this issue adduced at the post-trial hearing and the defendant's trial testimony as elicited by his trial counsel, defendant has not met his burden under *Strickland*.

■■■ The sixth alleged instance of ineffective assistance is trial counsel's failure to investigate defendant's case so as to find evidence favorable to him. Specifically, defendant cites his counsel's failure: to find Laura Shelley and Donald Ropele; to interview Foley before calling her as a defense witness; and to interview defendant's friend, John Avons, although defendant told him that he could testify to defendant's intoxication on October 7 and 8. Defendant asserts that testimony of Foley and Avons as to his intoxication might have exonerated him by proving that he was too intoxicated to have committed the murders and that a failure to interview such witnesses, when known to trial counsel, constitutes ineffective assistance. He also asserts that counsel's failure to find Shelley and Ropele to testify at trial substantially prejudiced him because they could have proved that Hubbard and Key were not at the scene of the murders and that the failure to investigate for and discover potential witnesses amounts to

ineffective assistance of counsel.

The State responds that Shelley's and Ropele's claim that Hubbard and Key were with them, not at the scene of the murders, on the morning of October 8 was fabricated and, therefore, not discoverable prior to trial. It cites defendant's trial counsel's testimony at the post-trial hearing that he did interview Foley and claims his vigorous cross-examination of her during the State's case in chief corroborates that fact. The State contends trial counsel's decision not to interview Avons was a matter of trial strategy. Alternatively, it asserts that Avons' testimony as to defendant's intoxication. would have been cumulative, since evidence of defendant's intoxication was presented at trial, and that the failure to present such testimony does not prejudice a defendant. Finally, it asserts that evidence of defendant's intoxication would have impeded his defense that O'Donnell shot Kelley and Roth.

Defendant has failed to establish that these alleged failures by trial counsel denied him the effective assistance of counsel. Preliminarily, we note that defendant did not allege in his motion for new trial that his trial counsel's assistance was ineffective due to his failure to find Shelley and Ropele. A written motion for new trial establishes the grounds for appeal and only issues raised in it can be considered by a court of review. (*People v. Caballero* (1984), 102 Ill. 2d 23, 31, 464 N.E.2d 223, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362.) Moreover, defendant cannot seriously contend that his trial counsel's failure to find Shelley and Ropele amounted to ineffective assistance of counsel when he also alleged in his motion for new trial that their testimony constituted newly discovered evidence entitling him to a new trial which, *inter alia,* could not have been discovered through the exercise of due diligence prior to trial since they were unknown to defendant, were not involved in or present at the occurrence, and were not revealed through discovery.

Defendant's trial counsel testified at the post-trial hearing that he did interview Foley. As such, defendant's contention that he did not is without merit. Moreover, in view of defendant's allegation that his trial counsel told him to "play down" the effects of alcohol on him on the night of the murders, we believe that his failure to interview John Avons was a matter of judgment or trial tactics. The decision to present a given witness is a matter of trial strategy, which cannot support a claim of ineffective assistance of counsel. *People v. Wright* (1986), 111 Ill. 2d 18, 26-27, 488 N.E.2d 973.

The cases cited by defendant do not compel a contrary conclusion. In *People v. Corder* (1982), 103 Ill. App. 3d 434, 431 N.E.2d 701, de-

fense counsel failed to interview or subpoena witnesses who could have testified that the defendant wore a beard at the time of the offense. The only occurrence witness for the State described the defendant as clean-shaven. The defendant had given his counsel a list of potential witnesses three weeks before trial and informed him four weeks before trial that his driver's license showed him with a beard as of six days after the offense was committed. Defense counsel made unsuccessful efforts to contact some of the witnesses. While he was aware of the defendant's driver's license and that the occurrence witness had described the defendant as clean-shaven, he introduced no evidence at trial to corroborate defendant's claim that he wore a beard at the time of the offense, although he had the list of potential witnesses. The court held that defense counsel's performance was actually incompetent and that his incompetence produced substantial prejudice to defendant without which the result of the trial would probably have been different. (103 Ill. App. 3d 434, 438, 431 N.E.2d 701.) In *Corder,* the only issue was the identification of the defendant. Defense counsel's failure to interview witnesses who could exonerate defendant could in no way have been construed as a matter of trial strategy. Here, in contrast, having decided, as defendant himself asserts, to minimize the effects of alcohol on defendant on the night of the murders, defense counsel's failure to interview Avons is explicable as a matter of trial tactics.

In *People v. Howard* (1979), 74 Ill. App. 3d 138, 392 N.E.2d 775, defense counsel failed to investigate the defendant's psychiatric history and discover records of the defendant's psychiatric hospitalization although she had mentioned it at a competency hearing and the records were readily discovered by the probation officer who prepared a pre-sentence report after defendant's conviction. The court held that defense counsel's failure to discover the records and his resultant failure to use them at defendant's competency hearing and trial constituted ineffective assistance of counsel. (74 Ill. App. 3d 138, 142, 392 N.E.2d 775.) The court rejected the argument that defense counsel's failure to introduce sufficient evidence at the trial, including the psychiatric record, to warrant an insanity defense instruction was a matter of trial tactics. It held that such trial tactics could not be considered sound where defense counsel failed to fully investigate and therefore lacked a full and complete knowledge of his case. (74 Ill. App. 3d 138, 142, 392 N.E.2d 775.) We believe *Howard* is distinguishable from the instant case. Therein, the evidence for which defense counsel failed to investigate was evidence which could have revealed facts of the defendant's psychiatric condition beyond those which she

was capable of revealing; specifically, that she had been diagnosed as paranoid. Here, in contrast, we do not believe that Avons or Foley could have revealed any facts of the defendant's intoxicated condition on the night of the murders beyond those which defendant himself was capable of revealing to his trial counsel.

Most importantly, there is no reasonable probability that the result of the trial would have been different had defense counsel interviewed Avons and had he and Foley testified to defendant's intoxication. (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) To raise a defense of voluntary intoxication a defendant must show that his intoxication was so extreme that it suspended all reason; merely being drunk or intoxicated is insufficient to raise the defense. (*People v. Moon* (1982), 107 Ill. App. 3d 568, 437 N.E.2d 823.) Moreover, where the record evidence indicates that the defendant acted with purpose or rationality or remembered the offense with clarity or detail, the defense of intoxication is unavailable. (*People v. Thompson* (1984), 125 Ill. App. 3d 665, 677, 466 N.E.2d 380.) At the post-trial hearing defendant testified that he "was under the influence of alcohol and drugs" and that as a result he "couldn't walk right" and "was stumbling, blacking out a little bit." This testimony of the defendant, the one person in the best position to know the effects of his intoxication, is insufficient to show that his powers of reason were suspended and thus that intoxication would have been an available defense at trial. This conclusion is buttressed by defendant's testimony at trial wherein he recounted the events of the evening with clarity and detail. As such, we conclude that even if defense counsel was incompetent in failing to interview Avons and have him and Foley testify to defendant's intoxication, defendant was not prejudiced thereby.

■■■ The seventh alleged instance of ineffective assistance, defense counsel's failure to tender the second paragraph of IPI Criminal 2d No. 3.02, is meritless. Defendant's argument is based on the false premise that the evidence against defendant was entirely circumstantial. As already noted, however, it was not. As such, defense counsel's failure to tender the second paragraph of that instruction, which must be given only when the evidence is entirely circumstantial, was not incompetent assistance. Counsel is not required to request an instruction when it would be futile to do so. (*People v. Johnson* (1981), 98 Ill. App. 3d 228, 424 N.E.2d 610.) Similarly, defendant's contention that the trial court erred when it did not *sua sponte* give that instruction is also meritless. Finally, because none of the alleged individual instances of ineffective assistance actually deprived defendant of his

constitutionally guaranteed right to counsel, it cannot be contended that they did so collectively.

Lastly, defendant contends that it was a violation of the United States and Illinois constitutions and the rules of statutory construction for the trial court to sentence him under the mandatory natural life provision instead of the discretionary natural life provision of section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1). Specifically, defendant argues that the murder of two or more individuals is a factor in imposing both a discretionary natural life sentence under subsection (a)(1)(b) of section 5—8—1 and a mandatory natural life sentence under subsection (a)(1)(c) of that section (Ill. Rev. Stat. 1981, ch. 38, pars. 1005—8—1(a)(1)(b), (a)(1)(c)). Because section 5—8—1 provides no basis to distinguish the defendants to be sentenced under one or the other of the subsections, defendant argues, trial courts may arbitrarily impose different punishment for the same type of offenses in violation of the due process and equal protection clauses (U.S. Const., amends. V, XIV) and the provision in the Illinois Constitution that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art. I, sec. 11). Defendant asserts that the solution is to require that he be sentenced under the permissive provision, subsection (a)(1)(b), or to interpret the mandatory provision, subsection (a)(1)(c), as permissive, since this may be done to avoid an unconstitutional statutory construction. Defendant asserts that the imposition of a mandatory natural life sentence also violated the rule of statutory construction that ambiguities in penal statutes, especially in those providing enhanced sentences, must be resolved in favor of the defendant. Defendant concludes that a new sentencing hearing is necessary at which the court may "consider the full range of sentencing options" available in section 5—8—1(a)(1) instead of being required to impose a natural life sentence.

The State responds that defendant has waived this issue by failing to object at the sentencing hearing and to include it in his motion for new trial. Alternatively, it asserts that the mandatory natural life provision under which he was sentenced is constitutional, does not conflict with the discretionary provision and, if it does, unambiguously controls it. The State argues that the legislative history of subsection (a)(1)(c) of section 5—8—1 reveals a legislative intent to specifically remove multiple murder as an aggravating factor allowing the imposition of a discretionary natural life sentence and to make it grounds for imposition of a mandatory life sentence. The State asserts that

the legislature used subsection (a)(1)(c) to do so instead of enumerating all of the aggravating factors in section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) which would allow the imposition of a discretionary life sentence under subsection (a)(1)(b). As such, the State argues, subsection (a)(1)(c) is the exclusive provision governing the sentencing of a defendant convicted of multiple murder and does not violate due process. The State asserts that *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, has rejected defendant's contention that subsection (a)(1)(c) may be read permissively. Finally, the State asserts that, if the two subsections of section 5—8—1(a)(1) do conflict, rules of statutory construction reveal that subsection (a)(1)(c) prevails over subsection (a)(1)(b).

Preliminarily, defendant has waived this issue by failing to object at the sentencing hearing and to raise it in his motion for new trial. Assuming, *arguendo*, that he had not waived it, it is meritless.

Penal statutes are to be strictly construed in favor of an accused; however, a court must give effect to the legislative intent behind the statute and must not read it so rigidly as to defeat that intent. (*People v. Jordan* (1984), 103 Ill. 2d 192, 205, 469 N.E.2d 569.) Moreover, statutory provisions which are in *pari materia* should be considered with reference to one another so that both may be given harmonious effect, and statutory provisions in apparent conflict must be construed in harmony with one another insofar as reasonably possible. (*People v. Maya* (1985), 105 Ill. 2d 281, 287, 473 N.E.2d 1287.) However, in cases of true conflict, specific statutory provisions prevail over general ones on the same subject. (*People v. Matzker* (1983), 115 Ill. App. 3d 70, 450 N.E.2d 395.) Finally, where a statute is ambiguous, the court may look to its legislative history to determine the legislative intent behind it. *People v. Boykin* (1983), 94 Ill. 2d 138, 141, 445 N.E.2d 1174.

Subsection (a)(1) of section 5—8—1 of the Unified Code of Corrections states:

> "(b) [i]f the court finds that the murder was accompanied by exceptionally brutal or heinous behavior *** or that any of the aggravating factors listed in subsection (b) of Section 9—1 *** are present, the court *may* sentence the defendant to a term of natural life imprisonment, or (c) if the defendant *** is found guilty of murdering more than one victim, the court *shall* sentence [him] to a term of natural life imprisonment." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1).)

Subsection (b) of section 9—1 of the Criminal Code of 1961 lists the aggravating factors permitting a death sentence and includes "mur-

dering two or more individuals." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b).) As both subsections (a)(1)(b) and (a)(1)(c) of section 5—8—1 utilize a conviction for multiple murders as a criterion for imposing discretionary and mandatory natural life sentences, section 5—8—1 is ambiguous. As such, we may look to extrinsic aids including the legislative history of this subsection and its subparts to resolve the ambiguity.

Subsection (a)(1)(c) was added to section 5—8—1 by Public Act 81—1118, effective July 1, 1980. (1979 Ill. Laws 4286-87.) Senate Bill 32, which introduced this amendment, provided that any person who is convicted of a mass, multiple or second murder shall be sentenced to a mandatory sentence of natural life imprisonment, unless, where appropriate, a sentence of death under section 9—1 is sought. (Final Legislative Synopsis and Digest, 81st Ill. Gen. Assem. (Senate), vol. I, no. 23 (1979).) Senator Keats, the bill's sponsor, stated: "[I]f someone commits a second murder, a mass murder or a multiple murder *** the minimum sentence available is life imprisonment. *** It does not rule out the death penalty, the prosecutor could ask for [it], but if he fails to get it, the minimum sentence is life in prison ***." (81st Ill. Gen. Assem., Senate Proceedings, April 24, 1979, at 29.) Representative Cullerton objected to the bill because it would "take away from the power of the court the right to impose punishment other than life imprisonment *** [and] take away all the discretion of a court." (81st Ill. Gen. Assem., House Proceedings, June 19, 1979, at 229.) In his amendatory veto of the bill, Governor James Thompson noted that it "intends to establish a mandatory sentence of life imprisonment." 3 Senate Journal of Ill. 4754-55 (October 3, 1979).

Thus, the legislative history of subsection (a)(1)(c) makes clear that the legislature intended to make a mandatory natural life sentence the controlling sentencing provision for those convicted of, *inter alia,* multiple murder. That is, under subsection (a)(1)(c), multiple murderers are required to be sentenced to a natural life term where a death sentence is not imposed. That this provision precludes the trial court's exercise of any sentencing discretion does not vitiate its validity. *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059.

*Taylor* has also rejected defendant's argument that subsection (a)(1)(c) may be read permissively and distinguished *People v. Davis* (1982), 93 Ill. 2d 155, 442 N.E.2d 855, on which defendant relies, as not requiring such a reading of that section. *Taylor* reviewed the reversal of two natural life sentences imposed under section 5—8—1(a)(1)(c). The trial court had read that section as requiring such sentences under the facts of that case. The appellate court held that, if

read as mandating natural life sentences, the provision would violate the constitutional requirement that all sentences be determined according to the seriousness of the offense and with the goal of rehabilitating the offender (Ill. Const. 1970, art. I, sec. 11) and the constitutional separation of powers (Ill. Const. 1970, art. II, sec. 1) in that it would invade the judiciary's inherent power to impose sentences. As such, the appellate court read "shall" as permissive, relying on *Davis*. *Davis* had involved a statute requiring a trial court to state its reasons for imposing a particular sentence. The supreme court held therein that the word "shall" in that statute was to be read as permissive to avoid construing it as an infringement upon the exclusive judicial power of imposing sentence. *People v. Davis* (1982), 93 Ill. 2d 155, 162, 442 N.E.2d 855.

In reversing the appellate court's determination, the supreme court in *Taylor* first noted that the legislature has the power to define conduct constituting a crime and to determine the nature and extent of punishment for it. (*People v. Taylor* (1984), 102 Ill. 2d 201, 205, 464 N.E.2d 1059.) It reasoned that the legislature had considered the goal of rehabilitation and the seriousness of multiple murders "in determining that in the public interest there must be a mandatory minimum sentence of natural life imprisonment." (102 Ill. 2d 201, 206, 464 N.E.2d 1059.) It concluded that article I, section 11, "does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crimes of two or more murders." (102 Ill. 2d 201, 206, 464 N.E.2d 1059.) The court then distinguished *Davis* by noting that *Taylor* involved "the undoubted legislative power to define crimes and fix punishments" and that a statute would be declared invalid only when it unduly infringed on judicial authority. Finally, it noted that when legislatures exercise their acknowledged power to fix punishments for crimes they necessarily limit the discretion of courts when imposing sentence. (102 Ill. 2d 201, 208, 464 N.E.2d 1059.) We believe that *Taylor* is dispositive although it did not involve the precise issue before us.

■■■ Moreover, the rules of statutory construction support rather than preclude a reading of subsection (a)(1)(c) of section 5—8—1 as mandatory. In addition to the rules previously cited, we must keep in mind that it is our duty to construe legislative acts so as to uphold their constitutionality and validity if it can reasonably be done (*McKenzie v. Johnson* (1983), 98 Ill. 2d 87, 103, 456 N.E.2d 73) and that constructions leading to logical results are favored over those leading to absurd results (*People v. Jones* (1985), 134 Ill. App. 3d 1048, 481

N.E.2d 726).

██ Applying the rules of statutory construction to this case, we conclude that subsection (a)(1)(c) of section 5—8—1 cannot be read permissively. It would be absurd to hold that the legislature intended merely to allow a trial court to consider imposing a natural life sentence upon conviction for multiple murder while simultaneously requiring it to do so. Moreover, the subsections of section 5—8—1, being in *pari materia,* may be harmonized if subsection (a)(1)(b) is read as allowing a court to impose a natural life sentence when any aggravating factor listed in section 9—1(b) except multiple murder is present, while (a)(1)(c), which specifically so states, is read as requiring a court to impose the same sentence only where the lone aggravating factor of multiple murder is involved. This construction is logical and avoids any conflict in the two subsections and, therefore, the constitutional infirmity contended for by defendant. Finally, if the two subsections do conflict, subsection (a)(1)(c), being the more specific and the later in time, controls subsection (a)(1)(b). We find no merit in defendant's argument that he was unconstitutionally sentenced to a mandatory natural life sentence.

For all of the foregoing reasons the judgment of the circuit court of Cook County and the sentence entered thereon are affirmed in their entirety.

Affirmed.

McNAMARA, P.J., and RIZZI, J., concur.